Rafael **FERNANDEZ–ROQUE, et al., Plaintiffs,**

v.

**William French SMITH, et al., Defendants.**

Moises **GARCIA–MIR, et al., Plaintiffs,**

v.

**William French SMITH, et al., Defendants.**

Orlando **CHAO–ESTRADA, Petitioner,**

v.

**William French SMITH, et al., Respondents.**

Civ. A. Nos. C81–1084A, C81–938A and C81–1350A.

United States District Court, N.D. Georgia, Atlanta Division.

Nov. 23, 1982.

See also, D.C. 91 F.R.D. 239.

Dale M. Schwartz, John A. Pickens, Myron N. Kramer, Deborah S. Ebel, Kenneth Hindman, David A. Webster, Atlanta, Ga., for plaintiffs.

Douglas P. Roberto, Asst. U.S. Atty., Atlanta, Ga., Daniel E. Fromstein, Dept. of Justice, Washington, D.C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SHOOB, District Judge.

These consolidated cases are before the Court on plaintiffs' renewed motion for entry of writs of habeas corpus as to those Cuban detainees in the plaintiff class who have been approved for release by defendants but remain incarcerated awaiting sponsors. The procedural history leading up to plaintiffs' original motion and its subsequent renewal is briefly outlined below.

On August 7, 1981, on plaintiffs' renewed motion for class certification, this Court conditionally certified a class of all Cuban nationals incarcerated at the Atlanta Federal Penitentiary who arrived in this country as part of the "Freedom Flotilla" of

1980. 91 F.R.D. 117, 122–24; *modified at* 91 F.R.D. 239, 240, n. 1. The Court also certified twelve subclasses, and issued a series of show cause orders to the government.

At the first hearing on August 17, 1981, the government failed to show sufficient cause why members of subclasses (1) and (2) should not be released. The Court then issued the writs of habeas corpus to the 226 detainee class members in subclasses (1) and (2). 91 F.R.D. 239, 243. These detainees were to be released on parole as soon as they were approved for sponsorship or resettlement by the United States Catholic Conference, or by any of the other ten agencies within the American Council of Volunteer Agencies. The Court also ordered the release on the same terms of 155 detainees as to whom the government announced on August 17, 1981, in open court, that it had no further objections to release.

Subsequently, the Court modified its order to permit the government to perform its own review of the cases of the 226 members of subclasses (1) and (2), under the Attorney General's "Status Review Plan." See order of this Court dated August 21, 1981. Since that date, the Court has issued no further orders granting writs of habeas corpus.

On October 20, 1981, plaintiffs moved for entry of writs of habeas corpus as to those class members who had been approved for release under the Attorney General's review plan since August 20, 1981, but remained incarcerated. In their Supplemental Memorandum filed November 4, 1981, plaintiffs requested the Court to defer ruling on their motion, and in its November 12, 1981, order the Court granted this request. On July 27, 1982, plaintiffs moved to renew their motion, and the Court ordered that a show cause hearing be held on September 3, 1982.

At the hearing plaintiffs presented evidence that continued detention, after approval for release, has an especially deleterious psychological impact upon potential releasees, and that defendants may be able to utilize available sponsorship alternatives, including individual, non-family sponsors, which could reduce significantly the release waiting time. Defendants presented evidence of the ongoing efforts being made to place detainees approved for release with suitable sponsors.

At the conclusion of the hearing the Court requested counsel for the parties to submit proposed findings and conclusions and a proposed order, and these were filed on October 21, 1982. The Court, having duly considered these submissions along with the evidence presented at the hearing, now enters the following findings of fact and conclusions of law.

*Findings of Fact*

1.

The petitioning members of the plaintiff class are citizens of Cuba who arrived in the United States as part of the "Freedom Flotilla" of April-June 1980 and are now incarcerated at the Atlanta Federal Penitentiary.

2.

In August 1981 the Attorney General instituted a Status Review Plan designed to determine which of those Cubans detained in Atlanta could be released from incarceration.

3.

As of September 3, 1982, 1207 detainees had been released pursuant to the Attorney General's review plan (T–106).[1] (References to the transcript of the September 3, 1982, hearing are marked "T–___".)

4.

There were, as of September 3, 1982, 1164 Cubans still detained at the Atlanta Federal Penitentiary (T–235).[2]

---

1. In its latest status report to the Court, filed on October 21, 1982, the government indicated that 1305 detainees had been released as of October 15, 1982.

2. The latest status report indicates that a total of 1094 Cubans were being detained as of October 21, 1982.

**5.**

Of the 1164 Cubans remaining at the Atlanta Federal Penitentiary on September 3, 1982, 171 had been approved for release by the Attorney General but were still incarcerated awaiting sponsorships (T–4).[3] Most of these individuals have been incarcerated in Atlanta for a total of more than two years (T–29–30).

**6.**

Among the 171 Cubans approved for release but still incarcerated were 79 who had been incarcerated for more than 60 days after approval, and among these were several who had been approved for release as early as October 1981 (Defendants' Exhibit 2, T–177–79).

**7.**

The Attorney General's review procedure entails a personal interview with each detained Cuban and a recommendation for or against release by the two-member panel that conducts the interview. The Commissioner of Immigration and Naturalization makes the final decision regarding the individual's approval or denial for release.

**8.**

Any individual approved for release is actually paroled only after a suitable sponsorship has been arranged for him. The sponsor assists the releasee in adjusting to our culture and society by providing food, shelter, clothing and emotional support during a transitional period. The sponsor also assists the releasee with locating a job and gaining educational, language or vocational training, as well as with learning all those things necessary to live and work in the community.

**9.**

Any individual approved for release may have such approval revoked by the Commissioner of Immigration and Naturalization or may have a "hold" put on his release by the Bureau of Prisons (BOP) (T–121–22, 162, 164).[4]

**10.**

Individuals approved for release but found in need of psychological or psychiatric treatment are transferred to the custody of the Public Health Service (PHS). Among those approved for release, some 42 Cubans had been referred to the PHS as of July 1, 1982 (Defendants' Exhibit 2.)[5]

**11.**

Individuals approved for release and referred to the PHS may receive treatment at the Atlanta Penitentiary or may be transferred to other federal facilities at Springfield, Missouri, and St. Elizabeth's Hospital in Washington, D.C., depending on the level of treatment and security deemed necessary (T–186). There are currently available three non-federal residential treatment facilities, with a total capacity of 123, to which PHS will release Cubans for whom it is responsible (T–191–92, 209–10).

**12.**

The names of those individuals who are approved for release to sponsors are forwarded to the Office of Refugee Resettlement (ORR), which coordinates the efforts of volunteer agencies and other groups to locate a sponsorship arrangement for each detainee.

**13.**

Currently there are two volunteer agencies—United States Catholic Conference (USCC) and American Council for Nationalities Service (ACNS)—with whom ORR has contracts for resettlement. These agencies ordinarily arrange for sponsorships either by family members or in a structured halfway house environment; individual, non-family sponsors are generally not utilized (T–146–47).

**14.**

At this time, because the number of available sponsors has declined and because of concurrent efforts to resettle recent Hai-

---

**3.** The government's latest status report shows 108 Cubans approved and awaiting release.

**4.** The government's October 21 status report indicates that 4 detainees approved for release

have been placed on hold awaiting re-review by the Commissioner because of misconduct.

**5.** As of October 15, 49 of those approved for release had been referred to PHS.

tian entrants, the volunteer agencies are accepting relatively few Cubans for placement.[6]

15.

ORR has published a "Request for Proposals" (R.F.P.) at 46 Fed.Reg. 15775 (March 9, 1981) soliciting proposals for grants to organizations willing to resettle Cubans. Grant recipients, known as special placement grantees, select detainees with special needs, such as alcoholics or drug-dependents, and provide them with particularized assistance. To date, approximately 15 special placement grantees have been used in resettling Cubans from the Atlanta Penitentiary (T–100).

16.

Although the published R.F.P. appears directed toward organizations and institutions, there is nothing to prevent ORR from entering into grant agreements with suitable individuals as well (T–150–51). However, individuals who contact ORR and express an interest in sponsoring Cubans are referred to a volunteer agency (T–131–32).

17.

A majority of the Cuban-American population, and thus a large number of potential sponsors, resides in the State of Florida (T–132).

18.

Pursuant to a request by the governor of Florida, made because of the heavy burden placed on that state's social services system by the recent influx of aliens, ORR has a policy of not resettling any Cubans in that state except with family members (T–131–32, 159). ORR will not fund any grantees under its R.F.P. in Florida (T–136), nor will it permit voluntary agencies to resettle those without family in Florida (T–171).

19.

On at least one occasion, ORR provided supplemental funds to the State of Florida in the amount of $31 million to aid in the delivery of social services to the large number of aliens there (T–131).

20.

There are potentially suitable sponsors, both within and without the State of Florida, whose letters and offers to serve as sponsors have been ignored (T–75–77).

21.

As demonstrated by the testimony of Mrs. Torna, individual, non-family sponsors can provide effective placements for at least some Cubans.

22.

There is no demonstrably significant relationship between the family status of a sponsor and the likelihood of a sponsorship "breakdown" (T–147). Instead, the key factor appears to be *screening* of potential sponsors, with a large percentage of breakdowns occurring even among family member sponsors where only minimal screening is done (T–144–46).

23.

Defendants are capable of doing the required thorough investigation of potential sponsors, regardless of whether they are family members. Already, potential sponsors must satisfy the volunteer agencies that they have the ability to be effective sponsors (T–91), and those seeking grants from ORR must meet the requirements of the R.F.P.

24.

There are means of communicating to those interested in becoming sponsors which have not been fully explored and utilized: Public Service Announcements over the Spanish International Network, advertisement in Spanish-language newspapers and on Spanish-language radio stations, creation of a toll-free number specifically for inquiries by potential sponsors, and direct contact with those approaching the volunteer agencies asking to be sponsors (T–77–78).

25.

Cubans who continue to be detained for significant periods of time after being approved for release suffer significant additional psychological harm as a result (T–42–45).

---

**6.** Of the 108 detainees awaiting release as of October 15, only 4 had been accepted for placement by the volunteer agencies (2 by USCC and 2 by ACNS).

**26.**

At least some of those who have been approved for release have not been adequately informed of the reason for their continued incarceration, creating further confusion, frustration and attendant psychological problems (T–33–34).

**27.**

Those Cubans who are approved for release are treated no differently by the Bureau of Prisons than those who have not been approved for release (Plaintiffs' Exhibit 1 at 4).

**28.**

The general conditions of confinement of the Cubans at the Atlanta Penitentiary are described by the parties' stipulations entered into for the purpose of this hearing and introduced as plaintiffs' Exhibit 1. These stipulations are hereby incorporated by reference into these Findings of Fact.

### Conclusions of Law

**1.**

This Court has jurisdiction over plaintiffs' request for habeas corpus relief under 28 U.S.C. § 2241 (habeas corpus); 28 U.S.C. § 1331 (federal question); and 8 U.S.C. § 1329 (review of denial of parole). *See* order of this Court dated August 20, 1981; *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049, 1054–57 (N.D.Ga.1981).

**2.**

■ The standard of review to be applied by the Court is whether the continued detention of detainees approved for release under the circumstances found above is in excess of defendants/respondents' statutory authority, is contrary to constitutional right, or is an abuse of defendants/respondents' discretion.[7] 28 U.S.C. § 2241(c)(3); 5 U.S.C. § 706; *Ahrens v. Rojas,* 292 F.2d 406, 411 (5th Cir.1961).

**3.**

■ The Court recognizes the dedicated and commendable efforts of the government to arrange sponsorships for releasable detainees that have the greatest possible likelihood of success. However, the restrictions placed upon potential sponsors must be closely and critically examined where individuals who have already been incarcerated for more than two years are approved for release but then remain incarcerated for significant periods of time awaiting sponsors. The adverse effects of such continued indefinite incarceration in a maximum security federal penitentiary cannot be overestimated. Under such circumstances, what might otherwise be reasonable restrictions on placement become patently unreasonable and arbitrary. Thus, while the Court appreciates that the State of Florida's social services system is already under a heavy burden, it cannot agree that the exclusion of all but family sponsorships from that state constitutes a reasonable restriction. The potential additional burden to Florida's social services system is only minimal in light of the relatively small number of Cubans now awaiting release.[8] Furthermore, the recent grant of supplemental funds to Florida by ORR indicates that the federal government recognizes its continuing obligation to assist the states in providing necessary social services to the recent Cuban arrivals.[9] Given the large

---

7. The conditions placed upon parole—here, the location of a suitable sponsor—are no less reviewable than the parole decision itself. A contrary view would render court review of the parole decision meaningless, because the government could avoid effective review by paroling detainees under such unreasonable conditions as would practically ensure their continued incarceration.

8. Only 108 detainees, or fewer than 10% of the total number of Cubans presently incarcerated in Atlanta, *see* notes 2 & 3 *supra,* are currently approved for release. Even if all of this num-

ber were immediately released to Florida, it cannot be reasonably said, in light of the 70,000 "Marielitas" already resettled in that state (T–133), that their arrival would constitute a significant additional burden on Florida's resources. This minimal potential economic impact on Florida is totally outweighed by the substantial actual harm suffered by detainees who have already been approved for release every day they remain incarcerated.

9. The Court takes notice of the fact that the government is already spending substantial sums of money to maintain detainees in a max-

number of potential sponsors in the State of Florida, and the pressing need to locate sponsors for Cuban detainees already determined releasable, the Court must conclude that restricting sponsorships in Florida to family members is an abuse of discretion.

4.

■ With respect to the utilization of individual non-family sponsors, the Court recognizes the desirability of having some sort of organizational backup should a particular sponsorship arrangement breakdown. However, ORR's practice of referring individuals interested in sponsoring Cubans to the volunteer agencies has the practical effect of excluding most of these individuals from sponsorship opportunities, because the volunteer agencies will not ordinarily make placements to non-family members. Also, although nothing precludes ORR from entering into grant agreements with individuals, the currently published R.F.P. is addressed only to organizations and institutions, and there is no evidence of grants ever having been made to individuals. Under the present circumstances, the Court finds that defendants/respondents' failure to make concerted efforts to locate suitable individual, non-family member sponsors is unreasonable and arbitrary. Where the means are available to screen potential sponsors, and there is no evidence that non-family members are less effective as sponsors than are relatives, there is no reason not to actively seek out such individual sponsors. The concern about backup in the event of sponsorship breakdown can be addressed by coordination with local social service agencies in the community where the releasee is placed. In any case, this latter concern is completely outweighed by the imperative need to free as quickly as possible detainees already long incarcerated who have been determined releasable. Accordingly, the Court concludes that defendants/respondents' failure to make concerted

efforts to locate, screen and place detainees with individual non-family member sponsors is an abuse of discretion.

5.

The Court is satisfied that reasonable efforts are being made to treat and place detainees referred to the Public Health Service because of mental problems. Accordingly, the Court concludes that there has been no abuse of discretion with respect to these detainees' conditions of parole; however, the Court will continue to monitor closely the cases referred to PHS.

6.

■ Although there have been abuses of discretion in the placement and administration of conditions on petitioners' parole, the issuance of writs of habeas corpus ordering the immediate release of Cubans determined releasable is neither desirable nor warranted. The Attorney General has not abused his discretion in detaining individuals approved for release pending location of sponsors. It is the placement of unreasonable restrictions on who may be a sponsor that the Court has found to be an abuse of discretion. Accordingly, the appropriate relief is not an order of immediate release but an order correcting the abuses found.

WHEREFORE, it is hereby ORDERED that defendants/respondents shall:

1) immediately cease to adhere to any policy, rule, or agreement prohibiting ORR from resettling class members to other than family members in the State of Florida, or prohibiting ORR from making grant agreements pursuant to its R.F.P. with potential sponsors in Florida;

2) immediately cease to adhere to any policy, rule, or agreement preventing any volunteer agency from resettling class members to other than family members in the State of Florida;

---

imum security penitentiary. With respect to detainees who the government itself has determined do not require detention in such an institution (*i.e.*, those approved for release), it seems to the Court that these funds would be

better spent in assisting states to provide essential social services, rather than in continuing the detainees' admittedly unnecessary incarceration.

3) immediately establish communication procedures reasonably calculated to inform the public of the need for sponsors for those approved for release from the Atlanta Penitentiary. These communications shall solicit inquiries from individuals and groups interested in becoming sponsors and shall clearly convey that sponsorship is not restricted to organizations or family members. All reasonably available means of communication shall be utilized, including the Spanish International television network, Spanish-language newspapers and radio stations, and contact with those individuals who direct inquiries about sponsorships to volunteer agencies, Bureau of Prison officials, and others. The Court expects that ORR will continue to provide initial resettlement funds for those who are placed with individual sponsors, as has been done for those placed through the volunteer agencies and through ORR grantees. Defendants/respondents shall report to the Court within 45 days of the date of this order indicating what steps have been taken to comply with this direction;

4) within 45 days of the date of this order, issue a revision of the R.F.P. published in the *Federal Register,* making it clear that proposals for resettlement by individuals and local groups are solicited and outlining a simplified procedure for making such proposals;

5) within 45 days of the date of this order, submit to the Court a plan for overseeing the release of class members to individual sponsors. Such plan should address staffing needs, means of using local resources for reporting by sponsors, and ways of using local resources as contacts for releasees with adjustment problems.

6) report in writing to this Court on the second Monday of each month, providing the following information:

a) the total number of individuals approved for release who remain incarcerated awaiting sponsors, and the explanation given to these individuals concerning the reasons for their continued incarceration;

b) the total number of individuals released to sponsors since the last report;

c) the projected schedule of releases for the next 30 days;

d) the name and alien number of each detainee who has been approved for release and awaiting a sponsor for more than 60 days;

e) an explanation of ·what efforts have been undertaken to find a sponsor for each individual in category (d) above and the projection for future efforts;

f) the total number of individuals approved for release and referred to the Public Health Service;

g) the total number of individuals in category (f) above who have been transferred to other federal facilities since the last report;

h) the total number of individuals in category (f) above who have been released to residential treatment facilities since the last report;

i) the name and alien number of each detainee in category (f) above who has been in the custody of PHS for more than 90 days;

j) an explanation of why the individuals in category (i) above have not been released to appropriate treatment facilities and what efforts are being made toward this end;

k) the total number of individuals who have been approved for release but had their approval rescinded by the Commissioner or their release put on hold by BOP and the reason for such action;

*l*) the name and alien number of each detainee in category (k) above whose approval remains rescinded or whose release remains on hold for more than 30 days, the reasons therefor, and projected future action with respect to each such detainee.

After reviewing the reports submitted pursuant to the foregoing order, the Court shall conduct such future hearings and conferences as it deems appropriate.