Rafael **FERNANDEZ–ROQUE,** et al., **Moises Garcia-Mir,** et al., **Orlando Chao-Estrada, Plaintiffs-Appellees,**

v.

**William French SMITH,** et al., **Defendants-Appellants.**

Rafael **FERNANDEZ–ROQUE,** et al., **Plaintiffs-Appellees,**

v.

**William French SMITH,** et al., **Defendants-Appellants.**

Nos. 83–8065, 83–8628.

United States Court of Appeals, Eleventh Circuit.

June 1, 1984.

***

Douglas P. Roberto, Asst. U.S. Atty., Atlanta, Ga., for defendants-appellants in No. 83–8065.

John M. Rogers, Barbara L. Herwig, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellants in No..83–8628.

James A. Peters, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for amicus State of Fla.

Deborah S. Ebel, Myron M. Kramer, Dale Schwartz, David Webster, Kenneth Hindman, Atlanta Legal Aid, Atlanta, Ga., for plaintiffs-appellees.

Harriet Rabb, Immigration Law Clinic, Columbia Univ. Sch. of Law, New York City, for amicus.

Before HENDERSON and HATCHETT, Circuit Judges, and JONES, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

This is a consolidated appeal from two judgments of the United States District Court for the Northern District of Georgia. Both cases primarily involve the rights of those Cuban nationals who entered the United States during the Mariel "Freedom Flotilla" in 1980 and are still detained in the Atlanta Federal Penitentiary.[1] The district court, in No. 83–8628, held that the Cubans awaiting parole possessed a liberty interest in their parole from administrative detention and that the Attorney General's Status Review Plan for the evaluation of parole did not comport with constitutional due process. *Fernandez-Roque v. Smith,* 567 F.Supp. 1115 (N.D.Ga.1983). In the other case, No. 83–8065, the district court found that the federal government abused its discretion by restricting the sponsorship of the Cubans approved for parole. *Fernandez-Roque v. Smith,* 557 F.Supp. 690 (N.D.Ga.1982). We reverse the judgments of the district court and remand for further proceedings.

Approximately 125,000 Cubans arrived in the United States during the spring and summer of 1980 as part of the Mariel "Freedom Flotilla." Most of them lacked visas or documents entitling them to legally enter the United States. Many admitted to convictions for criminal offenses in Cuba. The Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.,* allows for the exclusion of an alien[2] from the United States for a variety of reasons. 8 U.S.C. § 1182(a).[3] After exclusion hearings, the government determined that the majority of the Cubans should be denied entry into the United States and requested Cuba to accept the return of its citizens. So far, the Cuban government has refused to take them back.

The Attorney General is granted broad powers over immigration matters. *See* 8 U.S.C. § 1103(a). Excluded aliens normally are immediately deported, "unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." 8 U.S.C. § 1227(a). Pending deportation, the Attorney General may,

in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States ... and, when the purposes of such parole shall, in the opinion of the Attorney General have been served, the alien shall forth-

---

1. These cases do not implicate those Cubans who currently are released on parole or who may be detained in a facility other than the Atlanta Federal Penitentiary.

2. There is a basic distinction between excludable aliens and those subject to deportation. Excludable aliens are those who seek admission but have not been granted entry into the United States. Even if physically present in this country, they are legally considered as detained at the border. Deportable aliens, on the other hand, have succeeded in gaining entry into the United States, whether legally or illegally. The Cubans contend that this "entry fiction" by which excludable aliens legally are not within the United States, is no longer valid. That view

was recently rejected in *Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir.1984) (en banc). It has long been recognized that aliens subject to deportation possess greater rights than excluded aliens. *See Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21, 32 (1982); *Jean,* 727 F.2d at 961 n. 1 & 969. All of the Cubans involved in these cases have received an exclusion hearing and have been found to be excludable. *See* 8 U.S.C. §§ 1221–27.

3. The statute sets forth thirty-three separate grounds for exclusion, including lack of entry documents, conviction of a crime involving moral turpitude, insanity, drug addiction and alcoholism. 8 U.S.C. § 1182(a).

with return or be returned to the custody from which he was paroled ....

8 U.S.C. § 1182(d)(5)(A). The Attorney General paroled most of the Cuban nationals who participated in the Mariel "Freedom Flotilla." Although no longer in detention, the parole of the aliens does not change their legal status. They are still classified as excluded aliens and subject to deportation. *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246, 1249–50 (1958).

In 1981, the Attorney General adopted a Status Review Plan (the plan) to review each detainee's request for parole. The plan created a review panel selected from officials of the different divisions of the Department of Justice. Under the plan, the panel initially examines the file of the detainee. To recommend release, the panel must conclude that "(1) the detainee is presently a nonviolent person, (2) the detainee is likely to remain nonviolent, and (3) the detainee is unlikely to commit any criminal offenses following his release." Department of Justice, "Attorney General's Status Review Plan and Procedures" (approved April 28, 1983) at 4. If the panel decides in favor of parole, its recommendation is forwarded to the Commissioner of the Immigration and Naturalization Service (Commissioner) for approval.

If the Commissioner rejects the panel's recommendation or if the panel is unable to make a determination based solely on the detainee's file, the alien is personally interviewed by the panel. Written notice of the interview is furnished to the alien at least seven days in advance. At the interview, the detainee may be assisted by a person of his choice. He may examine the documents and may submit either written or oral information supporting his release.

After the interview, the panel forwards its recommendation to the Commissioner. If the Commissioner grants release, he may impose "such special conditions as considered appropriate by the Commissioner."

*Id.* at 7. If parole is denied, the alien remains in custody. In either case, the detainee is notified of the Commissioner's final decision in English and Spanish. The plan provides for at least annual reviews of an alien's case as long as he remains in detention.

Parole may be revoked if the alien is convicted in the United States of a felony or a serious misdemeanor. An alien who poses a clear and imminent danger to the community or himself may also be returned to custody. Finally, parole may be revoked if an alien released to a special placement project violates the conditions of his parole. Upon revocation of parole, the alien is returned to detention and any further petition for release is processed under the plan.

Even if approved for parole, an alien remains in detention until a suitable sponsor is found for him. The sponsors assist the alien to adapt to life in the United States and provide him with necessary support. The Office of Refugee Resettlement (ORR), of the Department of Health & Human Services, coordinates the search for sponsors. ORR may place parolees with voluntary charitable agencies, other groups and, initially, even individuals. Those aliens approved for parole but requiring psychological or psychiatric treatment are released to the Public Health Service (PHS).

The great majority of the Cubans who participated in the Mariel boatlift have resettled in Florida. Because of the heavy burden on that state's social services, the Governor of Florida requested that ORR restrict any additional resettlement in that state. In response to that request, ORR adopted a policy that it would not resettle any Cubans in Florida except with family members. ORR made a supplemental grant of $31 million to assist the state with its added costs.

ORR also revised its prior policy of authorizing individual non-family members as sponsors.[4] Although ORR originally ap-

---

**4.** The district court stated in its Findings of Fact that ORR contracted with two volunteer agencies, the United States Catholic Conference and the American Council for Nationalities Service to resettle the Cubans. "These agencies ordinarily arrange for sponsorships either by family

proved individuals, it decided that such persons could not supply the necessary services to the parolees and that structured environments were more amenable to a smooth transition. ORR also believed that individual sponsors suffered from a higher rate of "sponsorship breakdown" and the organizations provided necessary support in cases of a failed sponsorship.

Moises Garcia-Mir, who had arrived in the Freedom Flotilla, filed, on January 8, 1981, a class action on behalf of those Cubans who were still in detention.[5] The complaint sought injunctive relief and a declaratory judgment that continued incarceration was unlawful. Another Cuban national, Rafael Fernandez-Roque, initiated a separate class action suit seeking a writ of habeas corpus for the detainees who the Attorney General had refused to release because of lack of entry documents under 8 U.S.C. § 1182(a)(20). The district court consolidated those actions with Orlando Chao-Estrada's individual petition for habeas relief.

The court conditionally certified a class consisting of all participants in the Freedom Flotilla who were detained in Atlanta and divided the class into a number of subclasses. *Fernandez-Roque v. Smith*, 91 F.R.D. 117, 123, *as modified*, 91 F.R.D. 239, 240 n. 1 (N.D.Ga.1981). After a hearing, the district court ordered the release of some class members and the parole of others once sponsors were found. At the government's request, the district court modified its order so that the government could review, pursuant to the Attorney General's plan, those Cubans ordered released or paroled. *Fernandez-Roque v. Smith*, 91 F.R.D. 239 (N.D.Ga.1981).

members or in a structured half-way house environment; individual non-family sponsors are generally not utilized." *Fernandez-Roque v. Smith*, 557 F.Supp. at 693.

5. Because Garcia-Mir initially was detained in the federal penitentiary in Leavenworth, Kansas, he filed his suit in the United States District Court for the District of Kansas. Later, all the Cubans still incarcerated were transferred to Atlanta. The class action was then transferred

Upon the completion of the government's review, those Cubans determined not to be releasable renewed their petition for habeas corpus. The district court heard oral arguments and, in *Fernandez-Roque v. Smith*, 567 F.Supp. 1115 (N.D.Ga. 1983), held that the Attorney General's plan did not satisfy the constitutional due process requirements for those Cubans detained in the Atlanta Federal Penitentiary. Examining the immigration laws, the district court found that the government had statutory authority to detain aliens indefinitely in those cases where immediate exclusion was not a practical means to perpetuate its policy.[6]

The district court then considered whether continued detention of the aliens violated the fifth amendment to the Constitution. Although conceding that aliens have no constitutional rights to be admitted into the United States, *Landon v. Plasencia, supra*, the district court distinguished between admission and parole.

Petitioners in the instant case, however, do not seek formal admission to this country. They simply assert a right to be free from arbitrary detention despite the government's determination that they are excludable.

567 F.Supp. at 1125.

According to the district court, the incarcerated Cubans have a liberty interest to be free of administrative detention. The exclusion hearing provided a temporary basis for detention, but

[o]nce an excludable alien's detention can no longer be justified merely as a means to his exclusion, ... then a legitimate expectation arises that the detention will end unless some new justification for continuing the detention is established.

to the United States District Court for the Northern District of Georgia.

6. Amicus asserts that the INA does not support such detention. We find this argument unpersuasive and determine that the district court correctly analyzed the statutory authority. *See* Note, *The Indefinite Detention of Excluded Aliens: Statutory and Constitutional Justifications and Limitations*, 82 Mich.L.Rev. 61 (1983).

The basis for this expectation is simply the fundamental principle inherent in our constitutional system that all persons are entitled to their liberty absent some legally sufficient reason for detaining them.

*Id.* at 1128. Rejecting the Attorney General's plan as procedurally inadequate in face of this liberty interest, the district court imposed a wide range of elaborate procedures, including a presumption of releasability, the right to counsel, confrontation and cross-examination, the privilege against self-incrimination, and the right to a neutral hearing body. Under these procedures, to continue to detain an alien, the government must prove by "clear and convincing evidence that a detainee, if released, will be likely to abscond, to pose a risk to the national security, or to pose a significant and serious threat to persons or property in the United States." *Id.* at 1140 (footnote omitted). For those aliens whose parole is revoked, the district court required a preliminary determination and then a final revocation hearing identical to the detention hearing mandated for the Cubans seeking parole.

Prior to the completion of the Attorney General's examination, those Cubans approved for release but awaiting sponsors reasserted their request for habeas relief. After a show cause hearing on September 3, 1982, the district court reviewed the Attorney General's revised resettlement policies in Florida and his rejection of individual non-family members as sponsors. *Fernandez-Roque v. Smith*, 557 F.Supp. 690 (N.D.Ga.1982). The court balanced the effect of continued detention on the Cubans with the burden on the state caused by additional resettlement. Finding the burden to be small and "[g]iven the large number of potential sponsors in ... Florida, and the pressing need to locate sponsors for Cuban detainees already determined releasable ..." the court concluded that the Attorney General abused his dis-

cretion. *Id.* at 695–96. The immediate need to find sponsors, the court stated, also outweighed any difficulties brought on by sponsorship breakdown. In any event, the screening of potential sponsors would lessen such problems. Thus, the policy restricting individual non-family members from acting as sponsors also constituted an abuse of discretion.[7]

### I.

■ The distinction between admission and parole alluded to by the district court is central to its finding that the Cubans possess a liberty interest in their release, that the Attorney General's plan is procedurally inadequate, and that elaborate, additional proceedings are necessary to remedy this deficiency. On appeal, the Cubans rely heavily on what they perceive as the differences between admission and parole. *See* Appellees' Brief, No. 83–8628, at 15–18. It is beyond dispute that aliens have no constitutional right to be admitted into this country. *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21, 32 (1982); *Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103, 2119 (1945) (Murphy, J., concurring). Thus, if parole constitutes part of the admissions process, rather than a separate benefit as held by the district court, there would be no constitutional right to parole as well.

This court recently considered this precise issue in *Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984) (en banc). Haitians who had been excluded from the United States challenged, in an equal protection context, the government's purported racially discriminatory parole policy. The district court in that case stated that the Haitians' claim did not relate to their admission. "Plaintiffs' claim is that they cannot be denied parole ... because of their race and/or national origin." *Louis v. Nelson*, 544 F.Supp. 973, 998 (S.D.Fla.1982). A

---

7. In those instances where the aliens were paroled to the PHS for psychological or psychiatric treatment, the district court found that "reasonable efforts are being made to treat and

place ..." those detainees. Hence, there was no abuse of discretion. 557 F.Supp. at 696. There is no appeal from this aspect of the district court's opinion.

panel of this court drew a similar distinction between parole and admission. *Jean v. Nelson,* 711 F.2d 1455, 1484-85, *reh'g en banc granted,* 714 F.2d 96 (11th Cir.1983).

The en banc court disagreed with this portion of the panel opinion. *Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir.1984) (en banc). After an exhaustive analysis, the court stated that "[a]lthough the distinction between parole and admission ... is not an implausible one, we conclude that it cannot be reconciled with the Supreme Court's jurisprudence in this area." *Id.* at 969. Furthermore, "the decision to parole or detain an excludable alien is an integral part of the admissions process ...." *Id.* at 963. *See Wong Wing v. United States,* 163 U.S. 228, 235, 16 S.Ct. 977, 980, 41 L.Ed. 140, 142 (1896). Rejecting the distinction between admission and parole, the court concluded that "excludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right." *Jean,* 727 F.2d at 972.[8]

Like the court in *Jean,* we find *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), to be controlling. Ignatz Mezei was refused entry into the United States. No other country agreed to accept him. He had been confined on Ellis Island for twenty-one months when he petitioned for a writ of habeas corpus. The Court held that Mezei's continued detention did not violate any statutory or constitutional right.

Contrary to the Cubans' arguments, *Mezei* was not restricted to the admission of an alien into the United States. The Court stated the issue as

whether the Attorney General's continued exclusion of respondent without a hearing amounts to an unlawful detention so that courts may admit him temporarily to the United States on bond until arrangements are made for his departure abroad.

345 U.S. at 207, 73 S.Ct. at 627, 97 L.Ed. at 960. *Mezei* therefore relates to the rights of detained excluded aliens seeking parole. *See Jean,* 727 F.2d at 970.[9]

■ Finally, the court in *Jean* recognized the particular problem which would be created by accepting the rationale invoked by the district court in this case.

A foreign leader could eventually compel us to grant physical admission via parole to any aliens he wished by the simple expedient of sending them here and then refusing to take them back.

*Id.* at 975. Based on *Jean* and *Mezei,* we are compelled to conclude that parole is part of the admissions process. As such, its denial or revocation does not rise to the level of a constitutional infringement.[10] Because the Cubans lack a constitutional liberty interest, we need not reach the question of whether the Attorney General's plan satisfies due process. We therefore reverse the judgment of the district court in *Fernandez-Roque v. Smith,* 567 F.Supp. 1115 (N.D.Ga.1983).

## II.

■ In evaluating the sponsorship policy, the district court correctly invoked an

---

**8.** Excluded aliens may be able to challenge, under a constitutional theory, governmental action outside of the immigration context. · *See e.g., United States v. Henry,* 604 F.2d 908, 914 (5th Cir.1979) (an alien subject to criminal proceedings must be advised of *Miranda* rights). But, as explained in *Jean,* these cases do not limit the government's conduct in the immigration field where it possesses plenary authority. *Jean,* 727 F.2d at 964.

**9.** The Cubans also attempt to distinguish *Mezei* on other grounds. These were similarly rejected in *Jean,* 727 F.2d at 970 n. 16.

**10.** The complaint raises other grounds for relief. The Attorney General's plan and statements by President Carter allegedly give rise to a liberty

interest. The Cubans also claim that international law precludes their continued detention. *See* United Nations Protocol Relating to the Status of Refugees, Art. 31, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1967). The court in *Jean* discussed the impact of customary international law in that case. There, the Haitians introduced no evidence to "suggest that it is current international practice to regard the detention of uninvited aliens seeking admission as a violation of international law." 724 F.2d at 964 n. 4. The district court did not base its decision on these issues and we express no opinion as to their merits.

abuse of discretion standard. We cannot accept the arguments of the government and the state of Florida that the Attorney General's decisions are not subject to judicial review. The powers of Congress and the executive branch in immigration matters are extensive, but they are reviewable by the courts. "That the authority of the political branches in this area is plenary does not mean that it is wholly immune from judicial review." *Jean,* 727 F.2d at 975. *See Palma v. Verdeyen,* 676 F.2d 100, 105 (4th Cir.1982); *Soroa-Gonzales v. Civiletti,* 515 F.Supp. 1049, 1057 (N.D.Ga. 1981). Yet, because of the government's far-reaching authority, there has been an "historic deference of the courts to political branches ... in immigration matters ...." *Bertrand v. Sava,* 684 F.2d 204, 212 (2d Cir.1982). The standard of review of the Attorney General's actions is narrow; "the scope of that review is extremely limited." *Jean,* 727 F.2d at 976. The court in *Jean* applied the abuse of discretion criterion to the decision whether to parole an alien. We think it is equally applicable to the decision concerning the conditions of sponsorship. *Cf. Ahrens v. Rojas,* 292 F.2d 406, 411 (5th Cir.1961).[11]

■ As stated in *Bertrand, supra,* "the Attorney General's exercise of his broad discretionary power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary." 684 F.2d at 212–13. Moreover, a court should not substitute its own policy preferences for those of the Attorney General. *Id.* at 217.

■ We find that there is sufficient evidence in the record to support the reasonableness of the Attorney General's policies. Ms. Denise Blackburn, the Director of the Resettlement Branch of ORR, testified that "[t]his is a very, very difficult to place group of people ...." Transcript, Volume 24 at 174. Because of the problems inher-

ent in resettling the Cubans, Ms. Blackburn indicated that assistance from an organized program is crucial. *Id.* at 128. Sponsoring an alien is a burdensome task, especially for an individual. Organizations are more likely to know of and have access to community sources of aid. Not only does the alien require financial assistance, but he must receive support in all aspects of life, including psychological and sociological help. The Cubans are confronted with a new and unfamiliar culture and society. As Ms. Blackburn testified,

> I think that many people may be motivated by the best of intentions, but based on our experience in Florida with the extent of the breakdowns and the number of people who, for the best of intentions, took on those people, were not able to cope with the sociological problems, and that's how our problem with sponsorship breakdown got started.

*Id.* at 111. Organizations can also provide needed professional counseling. *Id.* at 110–11. If the sponsorship does fail, an organization can assist in finding a new placement and prevent the alien from being left on his own. *Id.* at 99, 129.

The plaintiffs-appellees introduced the testimony of Ms. Zelda Torna who had aided some Cubans after their arrival in the United States. Despite her commendable efforts, Ms. Torna admitted that some of the Cubans had originally been sponsored by someone else, which lends credence to the government's assertion of the need for structured arrangements. This does not mean that individuals could not become effective sponsors. *Id.* at 81. Yet, the Attorney General has made a policy choice to deal with a difficult problem. There is evidence to support his decision and the plaintiffs failed to show that this choice is so unreasonable to constitute an abuse of discretion.

11. As the district court noted, the decision imposing conditions on parole should be as reviewable as the decision on whether to grant parole. Otherwise, by placing excessively strict limitations upon an alien's parole status, the government could ensure the alien's continued incarceration, rendering any review of the parole decision itself meaningless. 557 F.Supp. at 695 n. 7.

The evidence also supports the restrictions placed on resettlement in Florida. Over 70,000 Cubans have been paroled into Florida and Ms. Blackburn testified that the state's "social service systems are at the breaking point." *Id.* at 131, 133. The governor requested ORR to place additional Cubans only with family members in Florida. In fact, Ms. Blackburn stated that

> To move people who are acknowledged to be more troublesome cases who would need additional services into that particular state, could be interpreted as basically an irresponsible placement.

*Id.* at 131. In view of the possibly large amounts of financial assistance required for these parolees and perhaps future parolees, it cannot be said that any burden on the state would be minimal, especially considering the existing number of parolees presently living in Florida.

The Refugee Assistance Amendments of 1982, Pub.L. No. 97–363, 96 Stat. 1734 (1982), also support the reasonableness of the Attorney General's restrictions. Section 4(a)(C)(i), amending 8 U.S.C. § 1522(a), affirms congressional policy not to place aliens in highly impacted areas except with relatives.[12] Manuel Fleitas, Director of ORR in Miami, informed state officials that Florida was to be considered an impacted area. Letter to Peter S. O'Donnell, June 9, 1982. Phillip Hawkes, Director of ORR, in a letter to Governor Graham, noted "the unique problems that Florida has faced." Letter to the Honorable Bob Graham, August 26, 1982. The statute expresses a congressional desire to limit resettlement in areas already highly impacted by the influx of refugees.

The district court considered this statute in connection with the Attorney General's motion for reconsideration. In denying the motion, the district court emphasized the introductory language that the director should limit resettlement in highly impacted areas "to the extent practicable and except under such unusual circumstances as the Director may recognize ...." 8 U.S.C. § 1522(a)(C). The district court treated the continued incarceration of those Cubans approved for parole and awaiting an "appropriate sponsor" as such an unusual circumstance. Denial of Reconsideration, Opinion at 4. Yet, it must be remembered that the Attorney General does not parole aliens without making provision for their welfare. Parole is conditioned on finding an appropriate sponsor. Locating such a sponsor is a part of the Attorney General's parole policy and necessary to assist the Cubans in their adjustment to American society. We cannot say that the restrictions placed on resettlement in Florida are so unreasonable as to constitute an abuse of discretion.

The judgments of the district court are REVERSED and REMANDED for consideration in light of *Jean* and for further proceedings consistent with this opinion.

---

**12.** The Refugee Assistance Amendments added, in pertinent part, the following subparagraphs to 8 U.S.C. § 1522(a):

> (B) The Director shall develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees within the United States.
>
> (C) Such policies and strategies, to the extent practicable and except under such unusual circumstances as the Director may recognize, shall—
>
> (i) insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area, and
>
> (ii) provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States and localities.

Pub.L. No. 97–363, 96 Stat. 1734 (1982). *See* 8 U.S.C. § 1522(a).