**Rafael FERNANDEZ–ROQUE, et al., Petitioners,**

**v.**

**William French SMITH, et al., Respondents.**

**Moises GARCIA–MIR, et al., Plaintiffs,**

**v.**

**William French SMITH, et al., Defendants.**

**Orlando CHAO–ESTRADA, Petitioner,**

**v.**

**William French SMITH, et al., Respondents.**

**Civ. A. Nos. C81–1084A, C81–938A and C81–1350A.**

United States District Court, N.D. Georgia, Atlanta Division.

Jan. 21, 1985.

Deborah Ebel, Dale Schwartz, Myron Kramer, Kenneth Hindman, David Webster, Atlanta, Ga., for plaintiffs.

Sharon Douglas Stokes, Larry D. Thompson, Atlanta, Ga., Lauri S. Filppu, Washington, D.C., for the government.

## ORDER

SHOOB, District Judge.

This order addresses what the immediate future holds for 147 Cubans who are currently detained at the Atlanta Federal Penitentiary.

## BACKGROUND

These 147 Cubans were among the approximately 125,000 Cubans who left Cuba in 1980 via Mariel Harbor and who came to the United States. Although some of the 125,000 were detained, the vast majority of these "Marielitos" were released on "parole"; that is, they were permitted to live freely in American society instead of in detention camps and prisons.

Approximately 1800 of the Marielitos who were not released were transferred to the Atlanta Federal Penitentiary in 1981, and they were joined by other Marielitos over the next few years. Attorneys for the group brought this lawsuit as a class action, asking that these detainees be released on parole and that they be granted refuge and asylum in this country. *See Fernandez-Roque v. Smith,* 567 F.Supp. 1115, 1119–20 (N.D.Ga.1983), *rev'd,* 734 F.2d 576 (11th Cir.1984).

In August, 1981, this Court ordered the government to show cause why various subclasses of the group of Cuban detainees should not be released. Because the government could show no reason for continuing to detain certain Marielitos who

clearly were not criminals or mental incompetents and who posed no threat to American society, this Court ordered their release. *Fernandez-Roque v. Smith*, 91 F.R.D. 239 (N.D.Ga.1981).

At the government's request, however, on August 21, 1981 the Court modified this order to permit the government to conduct its own review of these detainees under a "Status Review Plan" approved by the Attorney General. Under the Status Review Plan, panels of government officials began to review each detainee's case according to guidelines and procedures specified within the Plan itself. The standards approved by the Attorney General for determining whether a detainee is "releasable" are whether

(1) the detainee is presently a nonviolent person,

(2) the detainee is likely to remain nonviolent, and

(3) the detainee is unlikely to commit any criminal offenses following his release.

"Attorney General's Status Review Plan and Procedures" at 4. If the detainee is deemed "releasable," the Plan provides that the detainee

*shall* be paroled when a suitable sponsor or placement for him has been arranged.

(Emphasis added.)

Since the implementation of the Status Review Plan in 1981, the government's review panels have directed the release of approximately 2700 detainees. Based on its understanding that the government would follow the standards and procedures approved by the Attorney General in his Status Review Plan, this Court has deferred to the decisions of the government's review panels and, therefore, has entered no further orders of release. That under-

standing, however, is no longer accurate with respect to the 147 Cubans who are the subject of this order.

These 147 detainees were reviewed under the Attorney General's Status Review Plan. Government officials who conducted these reviews have declared that these detainees are not dangerous to society and that each of the 147 detainees is entitled to be released on parole, provided that each has a suitable sponsor. Thirty-five of these detainees have acceptable sponsors. While this group of 35 awaited release, the government halted the release program,[1] apparently as a result of its December 14, 1984 agreement with Cuba.[2]

Although the government has stopped releasing detainees who have been approved for release, counsel for the government has informed this Court that the Status Review Plan remains "in effect." Transcript of December 27, 1984 Hearing at 4. Subsequently, this Court ordered the government to show cause why these 147 detainees should not be released as soon as suitable sponsors were found. As is evident from the following discussion, the government has failed to show any good reason for continuing to detain these 147 persons, particularly those 35 detainees who have sponsors. Consequently, for the first time in over three years, this Court must order the release of a group of Cuban detainees: those 34 persons [3] who seek release, who have been found "not dangerous," and who have sponsors.

## THE ORDERS TO SHOW CAUSE

On January 7, 1985, this Court ordered the government to show cause (1) why those detainees already approved for re-

---

**1.** In fact, 20 detainees apparently had been issued civilian clothes and were dressed and ready to be released when the government suspended all releases.

**2.** Cuba agreed to accept the return of a group of 2746 Marielitos, at the rate of 100 to 150 each month, in exchange for the United States' acceptance of 3000 political prisoners and their families, and up to 20,000 other Cuban immigrants each year. Based on the government's responses to plaintiffs' discovery requests, it ap-

pears that the sole criterion for inclusion on the "list" to be deported was whether that person was in custody on specified dates. *See* Defendants' Response to Plaintiffs' Seventh Interrogatories to Defendants. It also appears that all 147 detainees who are the subject of this order are on the list to be deported.

**3.** Apparently, one of the 35 detainees who have been approved for release and who have sponsors no longer seeks release.

lease should not be released as soon as sponsors are located and approved, and (2) why the names of those detainees should not be released to counsel for plaintiffs.[4] The parties submitted briefs that addressed not only the merits of the dispute but also this Court's jurisdiction.

At a hearing on January 10, 1985, counsel for the government advised the Court that many of the 35 "releasable" Cuban detainees who had sponsors were dressed in civilian clothes, ready to leave the penitentiary, when the Commissioner of INS ordered that no Cuban detainees be released. In addition, counsel for the government stated that on January 9, 1985, the Attorney General issued a memorandum to the Commissioner of INS directing that the Status Review Plan remain in effect but that no Cuban detainees be released, pending a review of the Plan in light of the December 14, 1984 agreement with Cuba. Further, according to the government's counsel, 40 of the 147 "releasable" detainees allegedly had committed a "prohibited act" inside the prison after they were approved for release, and the names of three detainees in this group had already been sent to the Commissioner for a decision whether to rescind approval for release.[5] After hearing oral argument, the Court directed that although the government had produced no evidence that any of the 35 "releasable" detainees with sponsors had committed a prohibited act that would remove them from the "releasable" category, the government would be allowed several more days to produce specific evidence of misconduct by these 35 detainees.

Next, on January 11, 1985, at a hearing in chambers, counsel for the government advised the Court that several of the 147

"releasable" detainees had committed dangerous crimes in the United States, a further reason not to order the release of any of the group of 147.[6]

Then, on January 11, 1985, this Court issued a further order to show cause. That order directed the government to produce "particularized evidence" of prohibited acts within the prison, crimes within the United States, or any other circumstances that would justify removing any detainee approved for release from the list of "releasables". The order specified that plaintiffs' counsel should receive any such evidence 24 hours in advance of a hearing set for January 16, 1985. This order also directed the government to show cause at that hearing

> why as a result of the alleged commission of prohibited acts after they were placed on the release list, as set forth in the "Noonan affidavit", or for any other good reasons not previously presented to the Court, any of the above 35 detainees approved for release who had approved sponsors should not immediately be released on parole to their sponsors, and why any of the above 112 detainees approved for release but who do not yet have sponsors should not be immediately released on parole as soon as sponsors are located and approved.

On the day before the hearing, counsel for the government provided certain documents to plaintiffs' counsel, as required by the January 11 order, and also furnished the Court with a "courtesy copy" of the materials. These materials included declarations by Donald J. Young, an INS official, and William Noonan, Jr., Executive Assistant to the warden at the Atlanta

---

**4.** This second issue was resolved when the parties later agreed that the government would furnish to plaintiffs' counsel under seal the names of the 147 detainees at the Atlanta Penitentiary who have been approved for release and who are also on the list of 2,746 to be deported.

**5.** The affidavit of William Noonan, Executive Assistant to the Warden at the penitentiary, contained this information. This affidavit, however, did not make clear whether any of the

"releasable" detainees who had been ready to depart the penitentiary were among this group of 40 who allegedly had committed a "prohibited act" after being approved for release.

**6.** Counsel for the government submitted no evidence at that time to support these contentions and stated that they had no knowledge of whether the Commissioner was fully aware of these alleged dangerous crimes at the time he approved these detainees for release.

Penitentiary. Accompanying these declarations were other documents under seal. Exhibits 1–4 concerned criminal activity by members of the group of 147 "releasables." [7] A crucial fact revealed by Young's declaration is that *all this information was known by government officials when these same officials approved the detainees for release.* Exhibits 6–7 consisted of prison reports of the alleged "prohibited acts" within the prison by three "releasable" detainees with sponsors and by 24 without sponsors.[8]

At the January 16, 1985 hearing on the January 11 further order to show cause, the Court questioned government counsel about exhibit 6, the reports of the following prohibited acts by three "releasable" detainees with sponsors:

1. Amores-Tores: possession of one marijuana cigarette on July 4, 1984 (approved for release October 4, 1984);

2. Suarez-Padilla: refusal to report for work on November 16, 1983; given two extra hours duty (approved for release September 20, 1984);

3. Suarez-Rodriguez: fighting with another detainee on May 28, 1984; commissary privileges restricted for four weeks (approved for release September 12, 1984).

Transcript at 15–16. Counsel for plaintiffs introduced evidence, unchallenged by the government, that the panels which approved these detainees for release *knew of these alleged infractions at the time of approval.* Transcript at 26–27.

Apparently abandoning the government's previous intimations that these detainees somehow no longer satisfied the standards for "releasability" under the Attorney General's Status Review Plan, counsel for the government responded as follows:

> We are not refuting the Attorney General's or the Commissioner's decision that these people are dangerous or not dangerous under the Plan. We are only suggesting now that the circumstances

have changed with the agreement with Cuba. The Attorney General has the authority or other reasons outside of that plan to continue these people in detention.

> The primary reason would be the fear of absconding, and that is what we submit, based on the legal authority for the Attorney General, would justify continuing these people in detention.

Transcript at 18.

The Court reiterated that the government had this opportunity to show *any* reason why these detainees might be considered dangerous and that the government had failed to do so. Counsel for the government replied that its prior submissions (Exhibits 1–6) constituted all the evidence in its possession which would indicate that any of these detainees were dangerous. Transcript at 19–20. Thus, the sole reason articulated by the government for continuing to detain these 147 persons was the government's fear that these detainees would abscond.

Plaintiffs' counsel assailed the government's "fear of absconding" argument as well. Counsel pointed out that the government had produced no evidence to support this "subjective" fear. Transcript at 29–30. Counsel also noted that the government had failed to address specific criteria for measuring the likelihood of absconding, stated in *Bertrand v. Sava,* 684 F.2d 204 (2d Cir.1982). In response, counsel for the government argued that a case-by-case determination of the likelihood of absconding is not required. The government's counsel did admit, however, that the government had conducted no investigations into the likelihood that individual detainees would abscond, Transcript at 30; that she could produce no information about how many of the 2700 already released under the Status Review Plan had absconded, Transcript at 32; and that it was possible that these detainees would not be deported, if ever,

---

**7.** These exhibits, however, did not identify which of the detainees mentioned were among the 35 who had sponsors or the 112 who had no sponsors.

**8.** Exhibit 5 was a list of the 147 "releasable" detainees with the dates of the review panel decisions approving their release.

before one and a half to two and a half years, Transcript at 22.

The Court concluded the hearing by ordering that the 34 "releasable" detainees who have sponsors and who seek release would be released "immediately". The Court stated that it would allow the government four working days to make the necessary arrangements. Further, the Court stated that it would begin to hold hearings every ten days to two weeks concerning the release of any of the remaining 112 "releasables" who obtain sponsors; the first of these hearings was scheduled for January 30, 1985 at 3:00 p.m. The Court also denied the government's motion to stay its order of release pending appeal.

The Court has stated previously in this nine-day process, which has involved two orders to show cause and several conferences with the parties, that if the Court orders the release of any detainee it would issue a written order addressing its jurisdiction, clarifying its December 4, 1984 order partially decertifying the class, and making appropriate findings. This order fulfills those purposes.

## JURISDICTION

This Court concludes that it has jurisdiction to decide the issue of whether the Attorney General abused his discretion in refusing to release detainees who have been approved for release under the Status Review Plan and who have suitable sponsors, despite the existence of an agreement with Cuba for their eventual return to Cuba.[9]

First, the original complaints filed in this case broadly allege that the Attorney General has abused his discretion in detaining plaintiff class members. Given the complexity of this case and the numerous issues that have evolved over the past four years because of changing circumstances, all of which this Court is intimately familiar with, this Court determines that a specific formal amendment to the original complaint is not required.

Second, the appeal that is presently pending in the Eleventh Circuit Court of Appeals (No. 84–8993) from this Court's October 15, 1984 order does not deprive this Court of continuing jurisdiction over an entirely different issue. *See United States v. Hitchmon,* 602 F.2d 689 (5th Cir.1979) (*en banc*).[10]

Third, this Court's December 4, 1984 order, which partially decertified the *Fernandez-Roque* class solely on the issue of whether the Attorney General abused his discretion in denying parole to class members, does not deprive the Court of jurisdiction over the instant dispute. The plaintiffs' claim of abuse of discretion that ultimately necessitated the partial decertification order arose in the context of plaintiffs' Brief in Support of Habeas Corpus Petition, filed on November 15, 1982. That portion of the action was brought solely on behalf of those detainees who were denied *approval* for parole by the Attorney General.[11]

---

9. In fact, the return of these detainees to Cuba under this agreement is not a certainty, given that the Eleventh Circuit Court of Appeals is presently reviewing this Court's October 15, 1984 order concerning plaintiffs' asylum claims, and given that plaintiffs have raised other possibly valid claims which have not yet been litigated. Further, the Court points out that the United States Supreme Court recently has granted certiorari in *Jean v. Nelson,* — U.S. —, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984), and thus within the next several months may clarify the rights of excludable aliens.

10. On appeal to the Eleventh Circuit are the issues of whether plaintiffs are entitled to asylum as a class, based on membership in the Freedom Flotilla, and whether this Court's order reversing the decision of the Board of Immigration Appeals and remanding the cases of all class members to the Board for reopened asylum hearings was correct. The issue addressed in this order has nothing to do with the asylum claim; this order addresses whether continued detention of class members approved for release under the Status Review Plan is an abuse of discretion.

11. Plaintiffs' brief began as follows:

The ultimate issue presented at this critical juncture of the litigation is the legality of the continued incarceration in a federal penitentiary of those class members who have been administratively determined not releasable under the Attorney General's Status Review Plan.

In one order entered on July 7, 1983, 567 F.Supp. 1115, 1143–44 (N.D.Ga.1983), *rev'd on other grounds,* 734 F.2d 576 (11th Cir. 1984), and again in another order entered on August 28, 1984, this Court determined that the issue of "whether the Attorney General abused his discretion in denying parole to the currently detained class members could not be addressed on a classwide or subclasswide basis" and that, consequently, "plaintiffs wishing to raise this 'abuse of discretion issue' must do so in individual habeas corpus actions." In its December 4, 1984 order, the Court ordered that only those "individual Cuban detainees who have been denied release on parole by the Attorney General are free to commence individual habeas corpus actions on the 'abuse of discretion issue'"; the Court directed that the action will "continue to be maintained as a class action with respect to all other issues previously raised by the pleadings."

It was clearly this Court's intent to decertify the class solely on the issue of whether there was an abuse of discretion with respect to those detainees who had not been approved for release under the Status Review Plan. The Attorney General's *refusal to release those who had been approved* for release was not the subject of the December 4, 1984 decertification order.[12] To eliminate any uncertainty or ambiguity that may exist about the meaning of the December 4, 1984 order, the Court hereby MODIFIES that order to include at the end of that order the following statement:

> This December 4, 1984 order decertifies the class *solely* on the issue of whether the Attorney General abused his discretion as to those class members who were denied approval for release on parole; the class is not decertified on the issue of whether the Attorney General abused his discretion with respect to class members who have been approved for release on parole.

Finally, although plaintiffs in the past have raised the issue of abuse of discretion with respect to detainees who were approved for release but who remained imprisoned, 734 F.2d 576, 582 (11th Cir.1984), that issue [13] was far different from the issues presented by the continued detention of these 147 "releasable" detainees. Since the present dispute arose only after the December 14, 1984 agreement with Cuba, plaintiffs could not have been expected to raise these issues before now.

## FINDINGS

1. At present, the Attorney General's Status Review Plan is still in effect. Although the terms of the Plan state that the Commissioner may suspend the Plan if it appears probable that many or all of the detainees can be returned to Cuba or to any other country, neither the Commissioner nor the Attorney General has suspended the Plan.

2. As mentioned above, on August 20, 1981, after the class was certified and several show cause hearings were held, this Court ordered the release of 381 Cuban detainees on parole to appropriate sponsors, holding that their continued detention was an abuse of discretion. On August 21, 1981, at the request of the government, this Court modified its August 20, 1981 order and indefinitely stayed all further show cause hearings in light of the government's assurances that the Attorney General's Plan was in operation and would result in the release of those detainees whom the government determined to be releasable. *Fernandez-Roque v. Smith,* 91 F.R.D. 117, *as modified,* 91 F.R.D. 239 (N.D.Ga.1981).

3. Also as mentioned above, among the procedures approved by the Attorney Gen-

---

**12.** On December 4, 1984, this Court was not aware that an agreement with Cuba was forthcoming, or that those detainees approved for release would be denied release even though their actual deportation might not occur for almost two and a half years.

**13.** That issue was whether the Attorney General abused his discretion in refusing to resettle "releasable" Cuban detainees in Florida and in refusing to utilize individual, non-family sponsors.

eral in his Status Review Plan is the following:

> Any detainee whose release has been approved by the Commissioner, hereinafter referred to as "releasable" *shall* be paroled when a suitable sponsorship or placement for him has been arranged.

(Emphasis added.)

4. The Attorney General is refusing to release on parole to approved sponsors any of the 147 detainees approved for release under his Status Review Plan. Of this group, 35 detainees already had obtained sponsors when the government suspended all releases, and 34 of these still seek release. Efforts to obtain sponsors for the other 112 detainees continue. The Attorney General's stated reason for refusing to release any of these 147 "releasable" detainees is that all of them are on the list of 2,746 to be deported and, therefore, may abscond. Yet because the agreement calls for the deportation of only 100 to 150 Cuban detainees each month, deportation for many may not occur for almost two and a half years. Moreover, deportation for class members may be delayed even longer, depending on the Eleventh Circuit Court of Appeals' decision on the appeal of this Court's October 15, 1984 order, and depending on the resolution of plaintiffs' other pending claims.

5. In response to this Court's order to show cause of January 7, 1985, and to this Court's further order to show cause of January 11, 1985, the government has failed to produce *any* evidence to justify the continued detention of any "releasable" detainee who has a sponsor, even though the Court has provided the government with ample time and opportunities to do so: nine days, two separate show cause orders, and numerous conferences and hearings. None of the evidence submitted by the government supports its earlier suggestions that these detainees were approved for release by panels that lacked knowl-

edge of certain crimes or misconduct by the detainees. Moreover, the government has requested no extensions of time to produce more evidence.

Further, the government has offered no evidence whatsoever to support its position that the fear that these detainees might abscond justifies continued detention.[14] In these lengthy show cause proceedings, this Court has not insisted on a case-by-case assessment of the likelihood of absconding, but has insisted that the government produce *some* evidence to support its position.

6. For as long as the Attorney General's Status Review Plan remains in effect, the Attorney General abuses his discretion if he fails to follow the standards and procedures specified within his own Plan. *See Moret v. Karn,* 746 F.2d 989 (3d Cir.1984); *Shepherd v. Merit Systems Protection Board,* 652 F.2d 1040 (D.C.Cir.1981); *Piper v. Crosland,* 519 F.Supp. 962 (E.D.N.Y. 1981). If the terms of the Plan have any meaning, they must mean that if a detainee is found to meet the criteria for release, he must be released when a suitable sponsor is found.[15]

7. If the Attorney General should suspend or cancel the Plan as a result of the December 14, 1984 agreement with Cuba, it still may constitute an abuse of discretion for the Attorney General to refuse to release any "releasable" detainees in the absence of a finding that the detainee is likely to abscond if released, especially given that many of these "releasable" detainees might remain in prison for up to two and a half years before being deported to Cuba. *Leng May Ma v. Barber,* 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). The Court, however, need not decide this issue unless and until the Plan is suspended *and* releasable detainees are denied release to approved sponsors.

---

**14.** The Court notes that whether a detainee is likely to abscond is not presently a criterion for determining "releasability" under the Plan.

**15.** Among their other pending claims, plaintiffs also have argued that the 147 releasable detain-

ees have a federally created liberty interest in their release on parole, entitling them to a due process hearing before their release is denied, by virtue of the Attorney General's Plan. *See, e.g., Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980).

Accordingly, this Court ORDERS the release on parole of the 34 detainees who seek release, who have been approved for release, and who have sponsors. All 34 detainees in this group shall be released to their approved sponsors no later than 5:00 p.m. on January 22, 1985.