**Moises GARCIA–MIR, et al., Plaintiffs-Appellees,**

v.

**William French SMITH, et al., Defendants-Appellants.**

**Nos. 84–8993, 85–8043.**

United States Court of Appeals, Eleventh Circuit.

July 11, 1985.

---

Sharon D. Stokes, Asst. U.S. Atty., Atlanta, Ga., Lauri Steven Filppu, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.

Deborah S. Ebel, David Webster, Myron M. Kramer, Atlanta, Ga., for plaintiffs-appellees.

Before TJOFLAT and VANCE, Circuit Judges, and ATKINS *, District Judge.

PER CURIAM:

In the spring of 1980 approximately 125,-000 Cubans participated in a mass exodus from their country to the United States. Although the "Mariel Boatlift" Cubans were properly characterized as excludable aliens with no right of entry when they arrived on our shore, the vast majority of them were eventually paroled into this country and have been given the opportunity to apply for resident status. The government has, however, exercised its discretion under the immigration laws to refuse admission to a small percentage of the Mariels. Virtually all of these aliens have been issued final exclusion orders by immigration authorities, but have not been returned because Cuba has been unwilling to take them back. Of this group, about 1,800 have also been denied parole and remain incarcerated in the Atlanta federal penitentiary. Many, but not all, of the detainees have criminal records or histories of mental problems.

The appeals before us are but one stage in the complicated history of the 1,800 detainees' legal battle to gain release from custody and avoid return to Cuba. At this juncture, we consolidate two separate appeals for the convenience of the parties and the court, and we resolve three issues: (1) the validity of the district court's order requiring the Attorney General to resume procedures for releasing certain of the plaintiffs from custody under his Status Review Plan; (2) the validity of the district court's order requiring the government to reopen two of the Mariels' exclusion hearings based on new evidence that they have produced to support claims for asylum, and (3) the district court's jurisdiction to stay or set aside all other purported class members' exclusion orders on the basis of this new evidence despite their failure to make individual motions to reopen.

I

The history of this litigation is, as noted, complex. It has progressed along two largely independent strands, the first involving the Mariels' challenges to their continued detention, and the second their attempts to avoid being returned to Cuba.

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

Appeal No. 85–8043 relates to the plaintiffs' detention claim. That claim took shape on January 8, 1981, when Moises Garcia-Mir filed a class action alleging that he and his fellow Mariels were being incarcerated in violation of national and international law. The original complaint alleged that the district court had jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331, 1361 and 8 U.S.C. § 1329. Garcia-Mir was later allowed to amend his complaint to include habeas corpus, 28 U.S.C. § 2241, as an additional basis for federal jurisdiction. The primary charge at that point was that it was an abuse of discretion for the Attorney General to detain the Mariels indefinitely rather than parole them under 8 U.S.C. § 1182(d)(5)(A) when there was no possibility of repatriation. On August 7, 1981, the district court conditionally certified a class consisting of all Cuban nationals who had been part of the Freedom Flotilla, whose parole had been revoked by the INS, and who were or would be incarcerated in the Atlanta federal penitentiary, and began scheduling hearings on the detention claims. *Fernandez-Roque v. Smith*, 91 F.R.D. 117, 123 (N.D.Ga.1981). The court suspended its review, however, once the Attorney General instituted independent procedures under a special "Status Review Plan" to evaluate the necessity of each class member's continued detention.[1]

As of December 14, 1984, 147 of those still incarcerated in the Atlanta prison had been approved for release under the Plan. On that date, however, Cuba agreed to take back 2,746 Mariel Cubans, including those incarcerated in Atlanta, in exchange for the United States' resumption of the immigration policy that it had pursued toward Cuba until the Freedom Flotilla. After reaching this agreement, the Attorney General issued a directive suspending releases under the Plan until he could modify it to take into account the likelihood that an alien now faced with imminent deportation would abscond if released on parole. Shortly thereafter, 146 of the 147 detainees who had been approved requested the district court to order the Attorney General to release them on the ground that he was abusing his discretion in failing to follow his own rules. On January 7, 1985, the district court ordered the government to show cause why the approved individuals should not be released as soon as suitable sponsors were found. After two hearings, the district court rejected the Attorney General's increased likelihood of absconding argument for lack of objective evidence, and ordered the immediate release of the thirty-four detainees who had been approved for release and who had found sponsors prior to the Attorney General's suspension of releases. *Fernandez-Roque v. Smith*, 600 F.Supp. 1500, 1507 (N.D.Ga. 1985). The government's appeal in 85–8043 followed.[2]

Appeal No. 84–8993 relates to the second major thrust of the litigation; the plaintiffs' attempts to avoid being returned to Cuba. The plaintiffs initiated it on August 7, 1981, when they amended their complaint to request review under 8 U.S.C. § 1105a(b), and nullification of their exclusion orders on the ground that they were "refugees" under 8 U.S.C. § 1101(a)(42)(A), and therefore entitled to either asylum under 8 U.S.C. § 1158 or else withholding of deportation under 8 U.S.C. § 1253(h).[3] La-

---

**1.** Under the Attorney General's Status Review Plan, a detainee is to be released on parole to a qualified sponsor if the review board determines that: (1) the detainee is presently a nonviolent person; (2) the detainee is likely to remain nonviolent; and (3) the detainee is unlikely to commit any criminal offenses following his release.

**2.** The government also requested a stay of the district court's January 21 order, which this court granted on January 22 pending further order of this court. On February 1, 1985 the Supreme Court denied plaintiffs' application to vacate this court's stay. *Garcia-Mir v. Smith*, — U.S. —, — – —, 105 S.Ct. 948, 949–950, 83 L.Ed.2d 901 (1985).

**3.** In their proposed amendments, the plaintiffs also alleged: (1) that they were "refugees" as that term is used in the 1951 Convention Relating to the Status of Refugees ("Convention"), *opened for signature* July 28, 1951 (entered into force April 21, 1954), 189 U.N.T.S. 137, which was incorporated by reference in the 1962 Protocol Relating to the Status of Refugees ("Protocol"), January 31, 1967, 19 U.S.T. 6223, T.I.A.S.

ter, however, the district court concluded that the statutory exhaustion requirement of 8 U.S.C. § 1105a(c), combined with the "very narrow authority of the courts" to review exclusion orders generally, dictated that it limit its review to the claims of the 150 class members who had exhausted their administrative remedies by undergoing both an exclusion hearing before an immigration judge (IJ) and an appeal before the Board of Immigration Appeals (BIA). *Fernandez-Roque v. Smith*, 539 F.Supp. 925 (N.D.Ga.1982).[4]

Meanwhile, the plaintiffs had accumulated new evidence which they believed would lend support to their asylum and withholding of deportation claims. In order to bring this evidence into the litigation, and to comply with the statutory exhaustion requirement, the plaintiffs brought two administrative "test cases" which both parties stipulated would be binding "on all asylum/withholding of deportation issues relating to membership in the Freedom Flotilla as a social group, except with respect to statutory and regulatory exceptions to asylum/withholding eligibility." In the first, *Matter of Leon-Orosco*, one of the class members who had failed to appeal to the BIA the IJ's decision denying his asylum claim in his original exclusion hearing requested reopening before the IJ on the ground that the new evidence established his eligibility for asylum. In the second, *Matter of Rodriguez-Colas*, a class member who had properly exhausted his asylum claim in his initial exclusion proceeding

made a motion to reopen directly before the BIA in order to submit the new evidence as support for a new asylum request.

Both plaintiffs alleged in their motions to reopen that they should be granted asylum under 8 U.S.C. § 1158, or withholding of deportation under 8 U.S.C. § 1253(h) because they were members of a "social group", namely the Freedom Flotilla, who had "a well-founded fear of persecution" should they be repatriated to Cuba. They offered identical evidence to support their motions. First, they produced affidavits from thirteen Mariels who had voluntarily returned to Cuba in 1980 without permission of the Cuban authorities. The affidavits stated that on their return the Mariels had been incarcerated, tortured, indicted, and tried as "Mariel scum" who had illegally entered Cuba, and had then been cast adrift on the ocean without food, water or navigational equipment. Second, the claimants submitted two State Department Country Reports on Human Rights Practices in Cuba which documented the inhumane treatment received by the Cubans as they sought to leave Mariel Harbor. Third, they produced correspondence from the State Department indicating that the Cuban government initially resisted repatriation efforts by claiming that all those who had left via Mariel had made an irrevocable decision to leave Cuba. Fourth, they offered a statement from a United States Refugee Affairs Coordinator dated April 21, 1980, which stated that all Cubans who

No. 6577, 606 U.N.T.S. 268 (entered into force October 4, 1967) (entered into force for the United States, November 1, 1968); and (2) that therefore Article 33 of the Convention, as implemented in 8 U.S.C. § 1253(h)(1), prohibited their return unless it is determined, after balancing the degree of persecution with the degree of criminality, that the plaintiffs are exempted from Article 33 relief. The district court determined, however, that there were no significant differences between the relief provided in 8 U.S.C. § 1253(h) and that provided in the Convention and Protocol. *Fernandez-Roque v. Smith*, 539 F.Supp. 925, 931-35 (N.D.Ga. 1982).

**4.** The court's finding of limited jurisdiction came about only after the government had appealed its initial attempts to exercise jurisdiction

over all the asylum claims by issuing a temporary restraining order prohibiting further deportation of the class members pending further disposition. In its appeal, the government challenged the court's handling of the asylum claims as lacking in subject matter jurisdiction, incorrect on the merits, and in excess of its authority over immigration matters. This court reached only the first claim, remanding for clarification as to the nature of the district court's jurisdiction over the classwide asylum claims, and requesting that the court certify its decision directly for further review. *Fernandez-Roque v. Smith*, 671 F.2d 426, 431-32 (11th Cir.1982). The district court responded by issuing *Fernandez-Roque v. Smith*, 539 F.Supp. 925 (N.D.Ga. 1982), but neither party appealed.

had sought asylum in the Peruvian Embassy prior to the boatlift had a well-founded fear of persecution if they were to return to Cuba. Finally, they introduced the testimony of Jorge Dominguez, a professor of government at Harvard and an expert on Cuban affairs. He testified that the thirteen affidavits from the Cubans who had returned were credible, that the Freedom Flotilla emigrees had been treated differently from previous emigrees, and that if the Mariels were returned to Cuba they would initially be classified as dangerous and subject to restrictions on their liberty. Despite this evidence, the IJ denied Leon-Orosco's motion to reopen because he found that the Mariel Cubans were not a "social group" for asylum purposes. The BIA affirmed the denial, concluding that even if the Mariel Cubans were a social group they had failed to make out a prima facie case that they had a well-founded fear of persecution. In an almost identical opinion the BIA denied Rodriguez-Colas' motion to reopen.

Having thus lost their two "test cases", the plaintiffs returned to the district court and filed a motion entitled "Renewed Motion for Habeas Corpus to Review and Reverse Decision of Board of Immigration Appeals." The motion, which had the effect of updating and amending the plaintiffs' complaint, alleged that the BIA's refusal to reopen Leon-Orosco's and Rodriguez-Colas' exclusion hearings constituted an abuse of discretion, and claimed that the court could extend remedial action under section 1105a(b) to the entire class.[5] The court agreed with the plaintiffs on both

counts. After concluding that it now had jurisdiction over all the class members' asylum claims pursuant to 8 U.S.C. § 1105a(c) since "[a]t present, all class members have fully exhausted their administrative remedies with respect to their claims to asylum and withholding of deportation based on membership in the Freedom Flotilla," the court held that, in view of the evidence, the BIA had abused its discretion in denying the motions to reopen. *Fernandez-Roque v. Smith*, 599 F.Supp. 1103, 1108–10 (N.D. Ga.1984). It then ordered the BIA to reopen all the plaintiffs' exclusion cases, and set aside all class members' exclusion orders pending the outcome of the proceedings on remand to the BIA. *Id.* at 1105, 1109. The government appeals, challenging both the court's decision overturning the BIA's refusal to reopen as to Rodriguez-Colas and Leon-Orosco and its jurisdiction to set aside the entire class' exclusion orders prior to their making individual motions to reopen.[6]

## II

As a general matter, we believe that the district court's treatment of this litigation suggests that it views the plaintiffs as persons who should be accorded at least some of the legal protections given to those who have effected an entry into this country. This, however, improperly blurs the fundamental distinction between excludable aliens and deportable aliens which permeates our immigration law. *Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984) (en banc), *aff'd*, — U.S. —, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Excludable aliens

---

**5.** On the same day that plaintiffs filed their motion in district court, the Commissioner of INS, pursuant to 8 C.F.R. § 3.1(h)(iii), certified to the Attorney General for review two issues related to the BIA's decisions in *Leon-Orosco* and *Rodriguez-Colas*. In particular, the Commissioner of INS questioned the BIA's failure to consider the effect of the stipulations on the parties and its failure to rule on whether the Freedom Flotilla was a social group for asylum purposes. The district court delayed its proceedings pending the Attorney General's decision. The Attorney General ultimately approved the BIA's handling of both matters. 599 F.Supp. at 1106–07.

**6.** While this appeal was pending, class counsel distributed form motions to reopen to 1,628 of the detainees, and by February 4, 1985, 1,300 of the forms had been filled out and delivered to the district director of the INS. A few of these motions have been denied by an IJ, but no plaintiff has to our knowledge received a denial from the BIA. In any case, these post-appeal motions do not affect our disposition since the issue to be determined is whether the district court had jurisdiction at the time it suspended the entire class' exclusion orders.

are those who seek admission but have not been granted entry into the United States. Even if physically present in this country, they are legally considered detained at the border. This is known as the "entry fiction," and we recognized its continued validity in *Jean,* 727 F.2d at 969. Deportable aliens, on the other hand, have succeeded in either legally or illegally entering this country. Excludable aliens have fewer rights than do deportable aliens, and those seeking initial admission to this country have the fewest of all. *See Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). Though the plaintiffs' lengthy presence in this country might tend to induce the impression that they have entered in a legal sense, this would be an incorrect reading of the law. Ever since they arrived at our border with no claim to entry other than a desire—shared by many throughout the world—to become members of this society, they were properly characterized as excludable aliens and neither parole nor detention has had any effect on their status. *Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958). They continue to "have no constitutional rights with regard to their applications, and must be content to accept whatever statutory rights and privileges they are granted by Congress." *Jean,* 727 F.2d at 968. Furthermore, the contours of those rights that they do have are to be largely left to the discretion of the political branches.

These legal realities may be harsh, but they are that way by design. As the history of its immigration policy makes clear, this nation has long maintained as a fundamental aspect of its right to self-determination the prerogative to determine whether, and in what numbers, outsiders without any cognizable connection to this society shall be permitted to join it. Because this scheme weighs the nation's interest in self-determination so much more heavily than it does the alien's interest in entering, the courts—which are at times inclined to place limits on government discretion where important individual interests are at issue— should ordinarily abstain where excludable

aliens are concerned. In overriding the government's decisions about how best to handle the sudden influx of Mariel Cubans, the district court has failed to take account of those significant countervailing national concerns that have led our immigration law to place primary decisionmaking authority about such a problem squarely into the hands of the political branches.

### A

■ We first address the government's claim in No. 85–8043 that the district court exceeded its authority in ordering the government to resume its procedures for releasing the detainees under the Attorney General's Status Review Plan. We begin by determining whether the district court erred in using the traditional abuse of discretion standard in reviewing the Attorney General's suspension of releases under the Plan. As we stated in *Jean,* Congress has delegated remarkably broad discretion to executive officials under the Immigration and Naturalization Act, and these grants of statutory authority are nowhere more sweeping than in the context of parole of excludable aliens. 727 F.2d at 977. Specifically, Congress has delegated the following authority to the Attorney General:

The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). We observed in *Jean* that "the obverse of the grant of discretionary authority in § 1182(d)(5) to

parole an excluded alien is a grant of authority to deny parole." *Jean v. Nelson,* 727 F.2d at 977 (quoting *Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir.1982)). After thoroughly exploring the broad discretion given the Attorney General in making parole decisions, we concluded that a federal court's scope of review in such instances is not the traditional abuse of discretion standard, but rather is limited to ascertaining whether he has advanced "a facially legitimate and bona fide reason" for his decision. *Jean v. Nelson,* 727 F.2d at 977.

Plaintiffs concede that where the Attorney General acts directly under section 1182(d)(5), the *Jean* standard applies. Nonetheless, they offer two rationales to justify the district court's application of the traditional abuse of discretion standard in this case. First, they contend that the Attorney General has less discretion to deny parole under his specially adopted Status Review Plan than he does under the broad mandate of section 1182(d)(5) because the Plan limits the Attorney General's discretion to determinations of dangerousness. We reject this argument because we find that in temporarily suspending releases under the Plan, the Attorney General was acting pursuant to the authority delegated to him under section 1182(d)(5). In the memorandum that temporarily suspended releases under the Plan, the Attorney General specifically stated that he was doing so pursuant to the powers granted him under section 1182(d)(5). More importantly, section 1182(d)(5) is the only statute which delegates authority to the Attorney General to grant parole. The facially legitimate and bona fide reason standard of section 1182(d)(5) therefore applies to all of the Attorney General's parole decisions, whether made under the Status Review Plan or otherwise.

Plaintiffs' second argument for application of the traditional abuse of discretion standard is that a previous panel of this court applied that standard when reviewing the Attorney General's policy regarding conditions of sponsorship for parolees under the Plan. *See Fernandez-Roque v. Smith,* 734 F.2d 576, 582 (11th Cir.1984).

We cannot agree with plaintiffs' reading of that panel decision. Although the panel used the term "abuse of discretion" in its opinion, *id.* at 582–83, a reading of that statement in context indicates that the panel actually applied the standard of review enunciated in *Jean.* In setting out the appropriate standard of review, the *Fernandez-Roque* panel stated:

> The standard of review of the Attorney General's actions is narrow; "the scope of that review is extremely limited." *Jean,* 727 F.2d at 976. The court in *Jean* applied the abuse of discretion criterion to the decision whether to parole an alien. We think it is equally applicable to the decision concerning the conditions of sponsorship.

*Fernandez-Roque v. Smith,* 734 F.2d at 583. While the panel's use of language may not have been precise, its intent was clear—the standard enunciated in *Jean* was the appropriate standard for review.

■ The next question, then, is whether the Attorney General advanced a "facially legitimate and bona fide reason" for temporarily suspending releases under his Status Review Plan. The justification offered by the Attorney General for suspending releases was that Cuba's agreement to take back 2,746 Mariel Cubans increased the likelihood that an alien would abscond if released on parole. We hold that this is a facially legitimate and bona fide reason for the Attorney General's action, and that the district court therefore erred in overriding him by ordering the immediate release of the thirty-four detainees.

Our conclusion is buttressed by the facts surrounding the implementation and subsequent suspension of the Plan. In normal situations, parole determinations take account of the possibility that the excludable alien may abscond to avoid being returned to his home country. *See, e.g., Bertrand v. Sava,* 684 F.2d 204, 214–18 (2d Cir.1982); *Fernandez-Roque v. Smith,* 91 F.R.D. at 125. In the case of the Mariel Cubans however, the Status Review Plan was adopted on the premise that their home

country would continue to refuse to allow them to return. It did not take into consideration concerns such as the likelihood of absconding because many of those concerns were apparently irrelevant. Now that return to Cuba is possible, we think that it was entirely proper for the Attorney General to temporarily halt releases under the Plan on the basis of that traditional concern.

**B**

We next address No. 84–8993, in which the government asserts two challenges to the district court's rulings on the plaintiffs' motions to reopen their exclusion hearings. The government argues first that the court erred in ordering the BIA to reopen the exclusion hearings of class members Rodriguez-Colas and Leon-Orosco. Second, it argues that the court lacked jurisdiction to extend this order to all members of the class by setting aside their exclusion orders before they had made their own individual motions to reopen.

**(1)**

▮ Because it is necessary to resolve all doubts as to the district court's subject matter jurisdiction before proceeding to the merits, we address first the government's jurisdictional challenge. The issue to be determined is a narrow one. Although the government concedes that both Rodriguez-Colas and Leon-Orosco satisfied all the administrative exhaustion requirements that must precede the court's determination of whether new evidence required a reopening of their exclusion orders, it claims that the court erred in concluding that the BIA's disposition of those cases also served to satisfy the jurisdictional exhaustion requirements for the rest of the class.

As the district court recognized in *Fernandez-Roque v. Smith*, 539 F.Supp. at 944, the exhaustion statute severely limits the federal courts' review of exclusion orders. 8 U.S.C. § 1105a(b) permits review only on habeas corpus, and 8 U.S.C. § 1105a(c) further states that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations...." [7] Because the regulations give the alien a right to reopen for presentation of new evidence in support of an asylum claim, a given plaintiff's claim for section 1105a(b) relief based on the new evidence would, if brought individually, certainly be precluded until he had made a motion to reopen with the BIA. In its October 1984 order, however, the court determined that the jurisdictional prerequisite had been met for all members of the class even though it was unclear that any aside from Leon-Orosco and Rodriguez-Colas had made and had denied an individual motion to reopen.[8]

---

**7.** Once an alien receives an exclusion hearing before an IJ, *see* 8 C.F.R. §§ 236.1–236.7, he has the right to appeal his exclusion order to the BIA, *see* 8 C.F.R. § 236.7(b)(a). Once the appeal process has terminated or the time for appeal has run out, the alien is subject to deportation at any time but is permitted federal court review on habeas corpus. *See* 8 U.S.C. § 1105a(b). Furthermore, the alien may move for a reopening or reconsideration of his case to establish by means of new and material evidence that the exclusion order should be overturned if he can show good cause for failing to introduce that evidence in his original hearing. *See* 8 C.F.R. §§ 3.2, 3.8, 103.5, 208.11, 242.22.

**8.** Although some of the plaintiffs initially exhausted their administrative remedies with regard to their exclusion orders, *see Fernandez-Roque*, 539 F.Supp. at 944, the district court's jurisdiction to review the BIA's initial appeal has no relevance to its jurisdiction to review denials of motions to reopen. Since the latter are collateral attacks on the exclusion orders which are based on entirely new evidence and request activation of an entirely different stage of the administrative process, we view them as entirely new claims requiring independent exhaustion of the available administrative procedures.

The differing procedural postures of the initial asylum claims, *see* 539 F.Supp. at 935–36, do, however, highlight the difficulties involved in attempting to confer classwide relief on the asylum issue. Some members of the purported class raised their asylum claims and had that issue resolved against them in their exclusion proceedings. Others failed to raise their claims altogether and still others raised their claims but later abandoned them. When irregularities such as these outnumber the common elements, classwide treatment is not appropriate. *See also* note 11, *infra*.

*Fernandez-Roque v. Smith,* 599 F.Supp. at 1107. That finding evidently stemmed from the court's understanding that the government's stipulations in *Leon-Orosco* and *Rodriguez-Colas* relieved the entire class of the need to file individual motions to reopen and thus to exhaust their administrative remedies before repairing to the district court.

According to our reading, however, the stipulations expressed no such intent. The stipulations state only that the BIA's decisions in the two test cases would be binding on all parties with regard to the "asylum/withholding of deportation *issues* related to *membership in the Freedom Flotilla as a social group*" (emphasis added). Those terms do not suggest to us that the stipulations were meant to waive the entire administrative proceeding for what might well in certain cases be multi-issue *claims* for exclusion or withholding of deportation. Notwithstanding plaintiffs' protestations that our reading of the stipulations will

only lead to futile administrative procedures and therefore will constitute a waste of resources,[9] we believe that adherence to the exhaustion requirement will promote judicial and administrative efficiency in this case. Because the facts regarding each asylum claim vary, further administrative action would be necessary whatever the outcome of the two test cases on the merits. Had the government lost on the "social group" asylum issue, it would have to be given the opportunity to argue that a given plaintiff should still be deported on the basis of statutory and regulatory exceptions which preclude asylum or withholding of deportation even when the alien is a member of a persecuted social group.[10] As for the plaintiffs, losing the two test cases could not be dispositive for any individual because he would still have to be given the opportunity to claim eligibility for asylum or withholding of deportation on other grounds.[11] In sum, while the stip-

9. Plaintiffs' argument is that the government's interpretation of the stipulations renders them meaningless, and they further allege that requiring every individual to exhaust his administrative remedies would be futile since the evidence regarding membership in the social group and fear of persecution is identical for each class member and has already been considered and rejected by the agency.

 Aside from the fact that we believe that exhaustion is hardly futile where alternative claims for relief and alternative grounds for denying it remain available, we reject this argument because *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), dictates that we view futility arguments with circumspection. *Salfi* expressly held that a statutory exhaustion requirement could not be dispensed with "merely by a judicial conclusion of futility." 422 U.S. at 766, 95 S.Ct. at 2467. *See also Power Plant Div., Brown & Root Inc. v. O.S.H. R.C.,* 673 F.2d 111, 115 (5th Cir. Unit B 1982).

10. Plaintiffs acknowledge that the district court's order is somewhat overbroad since it stays the exclusion orders of even those individuals who will be ineligible for asylum or withholding of deportation because of certain statutory and regulatory exceptions, *see* 8 U.S.C. § 1253(h)(2); 8 C.F.R. § 208.8(f). They contend, however, that the court's order was proper because it is impossible to determine at this time which individuals will be ineligible under 8 U.S.C. § 1253(h)(2) and 8 C.F.R. § 208.8(f). Plaintiffs' contention is based on their mistaken belief that before an alien may be denied with-

holding of deportation or asylum under 8 U.S.C. § 1253(h)(2) or 8 C.F.R. § 208.8(f), the agency must balance the degree of persecution which an alien will face if deported against the seriousness of the alien's past criminal activity. Plaintiffs cite the *Handbook on Procedures and Criteria for Determining Refugee Status* as mandating this "balancing test." Both this court and the INS have previously rejected the balancing test. *See Fernandez-Roque v. Smith,* No. 84–8993, slip op. (11th Cir. Jan. 24, 1985); *Matter of Rodriguez-Coto,* No. A23 221 132, slip op. at 2–3 (BIA Feb. 21, 1985). Ineligible plaintiffs' motions to reopen may properly be denied without expenditure of further administrative or judicial resources.

11. The many factual variations which give rise to the plaintiffs' alternative claims, as well as the government's defenses, highlight a problem that has plagued this litigation throughout much of its existence. Decisions regarding parole, asylum, and withholding of deportation must be made only after considering the particular circumstances of each individual's case. The parties acknowledge that before any of the forms of relief being sought may be granted, individual hearings will be necessary so that the particular circumstances of each individual's case may be considered. Our holding requiring each class member to file an individual motion to reopen means that each class member will have received individual review of his claim by the INS prior to any judicial review. As the district

ulations serve to dispose of the persecution issue for all members of the class who may choose to include it in their individual motions to reopen, they do not give the court jurisdiction to take any action with regard to the plaintiffs' eligibility for asylum on the basis of newly presented evidence unless and until the BIA has first been given the opportunity to address all aspects of their claims in those motions.

 Our conclusion is bolstered by our belief that section 1105a(c) does not permit the government to waive the administrative reopening procedure even if it might want to do so. Plaintiffs correctly point out that the Supreme Court has held in a trio of cases that agencies may be permitted to waive a statutory exhaustion requirement in some instances. *See Weinberger v. Salfi*, 422 U.S. 749, 765-67, 95 S.Ct. 2457, 2466-68, 45 L.Ed.2d 522 (1975);

*Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). As the Court also made clear in *Salfi* and its progeny, however, where there exists a statutory requirement of administrative exhaustion, each participant in a class action must at the very least have "presented his claim" to the administrator. *Mathews v. Eldridge*, 424 U.S. at 329, 96 S.Ct. at 900, *citing Salfi*, 422 U.S. at 764, 95 S.Ct. at 2466.[12] Because that threshold requirement is a jurisdictional one, it cannot be satisfied by stipulation. In this case, presenting a claim to the BIA consists of making an individual motion to reopen. It is not clear whether any purported class member aside from Leon-Orosco and Rodriguez-Colas did so prior to the district court's order. Since we see no relevant distinction between them and the unnamed class members in *Salfi*, we must conclude that they have failed to satisfy

court has recognized in one of its prior decisions, once the class member has received individualized review of his particular claim, class treatment is no longer appropriate. *See Fernandez-Roque v. Smith*, 567 F.Supp. 1115, 1144 (N.D.Ga.1983), *rev'd on other grounds*, 734 F.2d at 576, 578 (11th Cir.1984). We, therefore, find that further class-wide treatment on these issues is inappropriate. We also note that continuing to treat these issues on a class-wide basis will necessarily result in some individual class members, at least temporarily, receiving relief that they are not entitled to under any circumstances, *see supra* note 10. Rule 23 was not designed to produce such results.

**12.** In *Salfi*, the named plaintiffs were bringing a constitutional challenge to a provision of the Social Security Act in their individual capacities and on behalf of a class of similarly situated individuals. The Supreme Court found that the *complaint was deficient as to the purported* class members in that it contained "no allegations that they have even filed an application with the Secretary, much less that he has rendered any decision, final or otherwise, review of which is sought." 422 U.S. at 764, 95 S.Ct. at 2466. In *Eldridge*, the Court clarified its holding in *Salfi* by stating that:

Salfi identified several conditions which must be satisfied in order to obtain judicial review under § 405(g). Of these, the requirement that there be a final decision by the Secretary after a hearing was regarded as

"central to the requisite grant of subject matter jurisdiction...." Implicit in *Salfi* however, is the principle that this condition consists of two elements only one of which is purely "jurisdictional" in the sense that it cannot be "waived" by the Secretary in a particular case. The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted. The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no "decision" of any type. And some decision by the Secretary is clearly required by the statute.

That this second requirement is an essential and distinct precondition for § 405(g) jurisdiction is evident from the different conclusions that we reached in *Salfi* with respect to the named appellees and the unnamed members of the class. As to the latter the complaint was found to be jurisdictionally deficient since it "contain[ed] no allegations that they have even filed an application with the Secretary."

*Mathews v. Eldridge*, 424 U.S. at 328-29, 96 S.Ct. at 899-900 (citations and footnote omitted).

To the extent that definition of the jurisdictional requirement is within the discretion of the agency, we also point out that the Attorney General, unlike the Secretary in *Salfi*, actively contends that the class members other than Rodriguez-Colas and Leon-Orosco have failed to exhaust their administrative remedies.

the threshold exhaustion requirement identified in that case.[13]

Beyond the requirement of individualized filing, however, we believe that the jurisdictional exhaustion requirement presented by section 1105a(c) is even more extensive than that identified in the statute before the court in *Salfi*. In that case, as in *Eldridge* and *Diaz*, the plaintiffs sought judicial review under 42 U.S.C. § 405(g), which governs review of denials of benefits by the Social Security Administration. The Court in *Salfi* found that once the initial filing had occurred, the particular wording of section 405(g) gave the Secretary some discretion to define when the statute's exhaustion requirement had been fulfilled. 422 U.S. at 766–67, 95 S.Ct. at 2467–68. Section 405(g) provides that:

> Any individual after *any final decision* of the Secretary made after a hearing to which he is a party, irrespective of the amount in controversy, may obtain a review of such decision by way of a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

42 U.S.C. 405(g) (emphasis added). The Court found that the term "final decision" was not defined in the Act, and that the Act allowed the Secretary to flesh out its meaning by regulation. The exhaustion requirement of 8 U.S.C. § 1105a(c) is, however, considerably more explicit. By providing in section 1105a(c) that an exclusion order "shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right," Congress made explicit that it intended to make exhaustion of all available administrative remedies an absolute prerequisite to judicial review. All individual class members are entitled, as a matter of right, not only to file motions to reopen their orders of exclusion but also to appeal an unfavorable ruling to the BIA. Only Leon-Orosco and Rodriguez-Colas have done both. They, therefore, are the only class members who can be said to have exhausted their administrative remedies under the terms of the jurisdictional statute.[14]

### (2)

Finally, we address the district court's holding that the BIA erred in failing to find that Rodriguez-Colas and Leon-Orosco had produced prima facie evidence that they had a "well-founded fear of persecution." [15]

---

**13.** We note also that exhaustion requirements should be seen as jurisdictional, and therefore nonwaivable, when the matter at issue is within the competence of the agency. *See Salfi*, 422 U.S. at 765, 95 S.Ct. at 2466.

We find additional support for this conclusion in our treatment of a similar jurisdictional requirement found in 29 U.S.C. § 660(a) which governs judicial review of decisions by the Occupational Safety Health Review Commission (OSHRC). Section 660(a) provides that:

> Any person adversely affected or aggrieved on an order of the Commission issued under subsection (c) of section 659 of this title may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or where the employer has its principal office, or in the Court of Appeals for the District of Columbia Circuit, by filing in such court within sixty days following the issuance of such order, a written petition praying that the order be modified or set aside.... No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

29 U.S.C. § 660(a). Although it has been argued that the section 660(a) requirement that an objection first be urged before the OSHRC is waivable under certain circumstances, *see Power Plant Div. Brown & Root, Inc. v. O.S.H.R.C.*, 673 F.2d 111, 112–13 (5th Cir. Unit B 1982), this court refused to find the requirement waivable since the claim being raised involved matters within the competence of the administrative agency. Similarly, the dispute here involves not a constitutional question or other matter outside the agency's authority, but rather an interpretation of the very statutes and regulations that the BIA has been entrusted with administering.

**14.** Our result would be the same even if we concluded that the district court had subject matter jurisdiction under 8 U.S.C. § 1105a(b)–(c), because those plaintiffs who had not exhausted their administrative remedies failed to state claims upon which relief could be granted. *See* Fed.R.Civ.P. 12(b)(6).

**15.** In *INS v. Stevic*, ── U.S. ──, 104 S.Ct. 2489, 2496, 2501, 81 L.Ed.2d 321 (1984), the Supreme Court discussed at length the appropriate standards for considering withholding of deporta-

The district court concluded that (1) the BIA had applied an improper legal standard in considering the motions; (2) the BIA had disregarded or mischaracterized the evidence which tended to establish the plaintiffs' well-founded fear of persecution; and (3) the BIA had impermissibly prejudged the case on the merits at the reopening stage. We disagree as to all three determinations, reverse the district court, and affirm the BIA's denial of both Leon-Orosco's and Rodriguez-Colas' motions to reopen.

Judicial review of denials of discretionary relief incident to deportation proceedings, including denials of motions to reopen, is limited to determining "whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious." *Jarecha v. INS,* 417 F.2d 220, 224 (5th Cir.1969) (quoting *Kam Ng v. Pilliod,* 279 F.2d 207, 210 (7th Cir.1960), *cert. denied,* 365 U.S. 860, 81 S.Ct. 828, 5 L.Ed.2d 823 (1961)).[16] Because the district court's decision was predicated solely on its review of administrative records, we review the district court's actions *de novo. Louisiana Environmental Society, Inc. v. Dole,* 707 F.2d 116, 119 (5th Cir.1983). We address each of the three reasons given by the district court for concluding that the BIA had improperly denied the motions to reopen.

In finding fault with the legal standard used by the BIA, the court concluded that it had contravened the directives of 8 U.S.C. § 1158 and 8 U.S.C. § 1101(a)(42)(A) by considering whether deportation of the plaintiffs was a "present reality" in determining whether the plaintiffs were entitled to a grant of asylum or refugee status. *Fernandez-Roque v. Smith,* 599 F.Supp. at 1108. The district court pointed out that the proper test under 8 U.S.C. § 1158 and 8 U.S.C. § 1101(a)(42)(A) for determining whether a plaintiff is entitled to refugee status and therefore eligible for asylum is "whether the alien has demonstrated a well-founded fear of persecution." *Id.* We agree with the district court that this is the proper standard to be applied, and after considering the BIA's decision and reviewing the record we conclude that this is precisely the standard that the BIA applied in considering the motions.

The district court's sole support for its conclusion consisted of two sentences near the end of the concluding paragraph of the BIA's six page, single-spaced opinion. The more appropriate place to look for the standard applied by the BIA in considering the motion is, in our view, the section of its opinion which explicitly sets out the various standards to be applied. There, the BIA articulated the very standard cited by the district court. It stated that "[i]n order to demonstrate prima facie eligibility for asylum, the applicant bears the burden of showing that he has a well-founded fear of persecution if returned to his native land." Further, in making its decision to deny Leon-Orosco's motion the BIA concluded that:

---

tion claims made pursuant to 8 U.S.C. § 1253(h) and asylum claims made pursuant to 8 U.S.C. § 1158. The court concluded that the appropriate standard for determining whether an alien is entitled to a withholding of deportation is whether the evidence establishes that it is more likely than not that the alien will be subject to persecution on one of the grounds specified in the statute. *Id.* In footnote eighteen of its opinion the Court acknowledged that the *well-founded fear of persecution* standard will apply to determinations of whether an alien may be entitled to a discretionary grant of asylum from the Attorney General pursuant to 8 U.S.C. § 1158(a). *Id.* at 2497. The court, however, did not decide the meaning of the phrase "well-founded fear of persecution." *Id.* at 2501.

**16.** The arbitrary or capricious standard enunciated in *Jarecha* is, of course, an abuse of discretion standard. We are aware that this court has used the words "abuse of discretion" without elaboration when reviewing denials of motions to reopen. *See, e.g., Vasquez-Contreras v. INS,* 582 F.2d 334, 335 (5th Cir.1978); *Faddah v. INS,* 553 F.2d 491, 492 n. 1 (5th Cir.1977). In those cases the court simply failed to articulate precisely the standard of review being applied. Because denials of motions to reopen are denials of discretionary relief incident to deportation proceedings, the arbitrary or capricious standard of *Jarecha* applies.

Our review of the record satisfies us that the applicant has not shown prima facie that his life or freedom would be threatened or that he will be persecuted or has a well-founded fear of persecution.

In our view these statements conclusively show that the BIA applied the appropriate standard in considering the motions to reopen. The district court's contrary conclusion is based on a misreading of the BIA's opinion.

■ As to its finding that the BIA had disregarded or mischaracterized evidence which tended to establish plaintiffs' prima facie case of a well-founded fear of persecution, the district court cited two pieces of evidence to support that conclusion. First, the district court faulted the BIA for characterizing the Mariel Cubans who attempted to return to Cuba in 1980 as "those Cubans who sought to enter Cuba without first obtaining permission and in violation of Cuban travel laws" and for "apparently attributing the persecution of returnees solely, or almost entirely, to their illegal entry into Cuba." *Fernandez-Roque v. Smith*, 599 F.Supp. at 1108. The factual characterization made by the BIA is, however, entirely correct. There is no dispute that those Cubans who returned to Cuba in 1980 did so without the Cuban government's permission and in violation of Cuban law.

The district court's real disagreement with the BIA's opinion is not that it mischaracterized the evidence, but rather that it apparently attributed the persecution of the returnees "solely, or almost entirely, to their illegal entry into Cuba." The BIA's decision indicates that it placed significance on the fact that the Mariel Cubans who returned in 1980 did so without the permission of the Cuban government. Specifically, the Board stated:

There has been no showing that the applicant's return to Cuba would result in treatment similar to that experienced by the Cuban nationals, who sought to enter Cuba's territory without first obtaining its permission in compliance with that country's immigration and customs laws.

On the contrary, the testimony of Professor Dominguez clearly suggests that Mariel participants who are returned pursuant to an agreement would not experience treatment similar to those nationals who attempted to illegally re-enter Cuba.

Our reading of the record indicates that this was both a fair characterization of the evidence and an entirely permissible conclusion to be drawn from that evidence. Professor Dominguez testified that it is against Cuban law to return to the country without an entry permit and that in the past Cuba has severely punished those emigrees who have attempted to return without an entry permit. He also stated that the absence of the permit was one of the aggravating circumstances for someone returning under these conditions and that those who "returned without an entry permit were prosecuted for that purpose." We therefore conclude that the BIA acted well within its discretion in assigning some significance to the fact that the Mariel Cubans who returned to Cuba in 1980 did so without the permission of the Cuban authorities. The district court's rejection of that decision constituted an improper substitution of its own view of the evidence for that of the BIA. *See Jarecha v. INS*, 417 F.2d at 225.

The district court cited the BIA's following interpretation of Professor Dominguez's testimony regarding the likely treatment of plaintiffs if they returned to Cuba as a second example of the BIA's mischaracterization of the evidence:

[T]he testimony of Professor Dominguez ... suggests that while Mariel participants so returned would not be comfortable, it would be primarily the result of the economic and social upheaval taking place in Cuba, which affects the entire population, rather than a specifically directed course of persecution.

*Fernandez-Roque v. Smith*, 599 F.Supp. at 1108–09. Again, we find that the district court has mischaracterized the BIA's opinion and improperly substituted its view of the evidence for that of the BIA. The BIA's opinion contains a very complete and

accurate summation of Professor Dominguez's testimony, and indeed takes note of each of the facts that the district court cites in its order as contradicting the BIA's conclusion. Specifically, the BIA recognizes that Professor Dominguez was of the opinion that even if the Mariel Cubans were returned to Cuba pursuant to an agreement, they would nevertheless probably be classified "peligrosidad" (state of dangerousness) and that it would be a minimum of four or five years before they were completely reintegrated into Cuban society and cleansed of the enemy taint. While Professor Dominguez's testimony might support a conclusion that the Mariel Cubans would be subject to a directed course of persecution as a group even if returned pursuant to an agreement, his testimony also supports other conclusions including one which attributes any discomfort from which the Mariel Cubans would suffer primarily to Cuba's current economic and social upheaval. The primary stigma that Professor Dominguez felt would face the Mariel Cubans if they were returned pursuant to an agreement would be their characterization as "peligrosidad." His testimony indicates, however, that many Cubans who have no connection at all with Mariel Harbor or the Freedom Flotilla currently suffer from the arbitrary imposition of this stigma. Further, Professor Dominguez's testimony indicates that Cuba has been in a state of social and economic upheaval since the mid to late 1970's and that a number of consequences, including restrictions on freedom and economic hardship, have resulted from those problems.

Finally, the district court found that the BIA had prejudged the case on its merits, instead of limiting its inquiry to whether plaintiffs had presented a prima facie case. The only support given for this finding is the sentence that, "[a]lthough BIA need not have assumed that plaintiffs would present more persuasive evidence in a reopened hearing, it incorrectly assumed that plaintiffs would have *no* further evidence to present." *Id.* at 1109. The BIA's speculation as to whether more evidence would be available at a hearing on the merits is insufficient to support a finding that the BIA abused its discretion by prejudging the merits of the plaintiffs' claims.

## III

In summary, we conclude in appeal No. 85–8043 that the district court erred in applying the traditional abuse of discretion standard, instead of the facially legitimate and bona fide reason standard enunciated by this court in *Jean*, 727 F.2d at 975–79, to the Attorney General's temporary suspension of releases under his Status Review Plan. Because the Attorney General's order was issued pursuant to the authority granted him under 8 U.S.C. § 1182(d)(5), the *Jean* standard should have been applied. Applying the appropriate standard, we conclude that the Attorney General's concern with respect to the likelihood of absconding is a facially legitimate and bona fide reason for suspending releases under the Plan, and we therefore reverse the district court's contrary ruling.

In appeal No. 84–8993, we conclude that the district court had subject matter jurisdiction only over the individual habeas petitions of Leon-Orosco and Rodriguez-Colas. In reaching this conclusion, we have carefully examined the language of the stipulations which plaintiffs claim to have conferred jurisdiction, the express language of 8 U.S.C. § 1105a(c), and the Supreme Court decisions in *Salfi, Mathews,* and *Diaz,* and we have determined that the parties did not and could not stipulate to the waiver of the exhaustion requirement of section 1105a(c). Because Leon-Orosco and Rodriguez-Colas were the only class members who had filed and exhausted individual motions to reopen, their habeas petitions were the only ones properly before the district court.

Finally, we conclude that the district court erred in holding that the BIA abused its discretion in denying Leon-Orosco's and Rodriguez-Colas' individual motions to reopen. In considering whether those plaintiffs had made out a prima facie asylum claim the BIA applied the well founded fear of persecution standard as is required by the statutes and regulations. The

BIA's decision contains a complete and accurate summation of the evidence presented by Leon-Orosco and Rodriguez-Colas in support of their motions, and its decision to deny the motions is supported by the evidence.

REVERSED.