[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-15234
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 3, 2011
JOHN LEY
CLERK

Agency No. A096-007-117


WHAN QUANG MING,
a.k.a. Quan Min Wang,

                                        Petitioner,

                    versus

U.S. ATTORNEY GENERAL,

                                        Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(June 3, 2011)

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Whan Quang Ming, a native and citizen of China, petitions for review of the Board of Immigration Appeals's ("BIA") denial of his motion to reopen his removal proceedings for the purpose of filing a subsequent asylum petition, 8 U.S.C. §§ 1158, 1229a(c)(7). He argues that he established changed country conditions sufficient to support an out-of-time motion when he showed that, since the time of his removal proceedings, he has married a Chinese citizen and had two children in violation of China's coercive birth-limitation policy. For the reasons set forth below, we affirm.

I.

In 2002, Ming applied unsuccessfully for admission under the Visa Waiver Pilot Program and subsequently was referred to the Immigration Court to address his eligibility for asylum or withholding of removal. His 2003 asylum application indicated that he was 22 years old, unmarried, and childless. He sought asylum based on political opinion and membership in a particular social group, as well as relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). He alleged that local police had detained, beaten, and abused him due to his practice of Falun Gong, and that he had been forced to write a statement of repentance that promised that he would stop practicing Falun Gong. The Immigration Judge ("IJ") denied

2

asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and CAT relief, and in 2004, the BIA summarily dismissed his appeal.

In 2010, Ming moved to reopen the removal proceedings on the basis of "changed country personal circumstances and newly discovered evidence." He had married his wife, Jie Zhou, in June 2009, and they had two children in March 2008 and September 2009. He feared that he or his wife would be sterilized and severely fined due to having had a second child without permission. He stated that, if he did not pay the fine, he would be detained, the family's home would be destroyed, or he otherwise would be punished severely.

Ming attached a new asylum application, which gave his name as Quan Min Wang. The application indicated that he and Zhou both were born in Whenzhou, Zhejiang Province, and that their sons were dual citizens of China and the United States. Zhou was in asylum proceedings of her own at that time. He alleged that his mother-in-law, mother, uncle, friends, and neighbors all were forced to be sterilized. His attached statement indicated that he and Zhou had definite plans to have more children in the future, that he feared that he would be sterilized or fined for having a second child, and that he would not return to China without Zhou and their children. He further stated that the Chinese government had "recently issued new regulations regarding its coercive birth control policy as it applied to [Ming]

and [his] family," and that he "definitely [would] be subject to sterilization, even though [his] children were born in the United States."

Ming attached a letter from Yin Zhou Village, stating that the village strictly implements Zhejiang Province's family-planning regulations. Under these regulations, if a couple's first-born child is a boy, an intrauterine device ("IUD") must be inserted and a second birth is not allowed. If the couple has an unauthorized second child, they must be sterilized and must pay a social foster fee, based on six to ten times the per capita net income of the local residents. Exceptions to the policy are permitted only for individuals who have attained citizenship or permanent-resident status in the United States. Because Ming and Zhou did not have legal status in the United States and, at the time of writing, she was pregnant with their second child, the letter stated that they would be required to abort the pregnancy upon their return or, if the second child was born, to report to the family-planning office for sterilization.

Family members attested that identical descriptions of the policy were given by the family-planning offices of Qi Du Town, of which Yin Zhou Village is a part, as well as another village in Zhejiang Province. Zhou's sister-in-law submitted a letter indicating that she received an IUD after her son's birth in 2002 but secretly removed it, and when she had an unauthorized second child in 2006,

4

she was sterilized and fined 23,000 yuan.  A fellow villager described her own forced sterilization and fine in 2008.

Ming also attached a report by Dr. Flora Sapio of Julius-Maximilians University in Germany, which purported to assess the thoroughness, accuracy, and reliability of the State Department's 2007 Country Report on China.  Also included were human-rights and socioeconomic perspectives on the one-child policy; articles, policy statements, and congressional testimony describing enforcement and protests in various provinces, primarily Fujian Province; and stories of forced late-term abortions carried out between 1981 and 2009.

In Ming's supporting materials, some individuals stated that the one-child policy became less stringent in 2007, when 19 of the 31 provinces began to permit rural families to have a second child if the first was a girl, several municipalities began to allow younger couples with no siblings to have two children, and certain ethnic minorities were allowed to have more than one child.  They did not, however, indicate that the coercive nature of the policy had changed.  Another individual stated in 2009 that he had offered congressional testimony on this topic in 1998, 2001, and 2004, but that the impact of the earlier hearings was minimal and China's coercive birth-control policy "remain[ed] essentially unchanged."  A congressional report noted that Chinese authorities "continued to interfere with

and control" women's reproduction in 2009, noted progress with respect to permitting certain families to have a second child, and described the continuing use of coercive enforcement measures. An American news article stated that "China's basic policy—in effect since the late 1970s—was reviewed and renewed without change" in December 2006. Another article stated that China's stance on the policy "has not wavered," but that leaders were permitting more open discussion of the issue, and some had suggested that the policy could be overhauled in the future.

A report by U.S. Citizenship and Immigration Services, based on information received from the family-planning office in Fujian Province, stated that children of Chinese residents who were born abroad but do not have permanent residence overseas are treated as Chinese citizens for domestic administrative purposes, regardless of the foreign nationalities conferred by their countries of birth. A child who has gone through the formalities of becoming a Chinese resident will be counted toward family-planning limits, but a child who has not gone through those formalities will not be counted. Parents who had not obtained legal or *de facto* long-term residence overseas would be sanctioned for any violations that occurred while they were abroad. Ming also attached to his application an unpublished case from the Second Circuit, as well as statements by

6

two men and one woman from Fujian Province, each of whom was forced by local authorities to undergo sterilization.

The State Department's 2009 Country Report stated that the Chinese government had continued its coercive birth-limitation policy, in some cases including forced abortion and sterilization. The law prohibited the use of physical coercion to compel abortions or sterilizations, but intense pressure to meet birth-limitation targets resulted in instances of local birth-planning officials using physical coercion to meet the goals. Such practices included IUDs and female sterilization, which accounted for more than 80% of the birth-control methods used; other birth-control methods; and abortion of certain pregnancies. In families with two children, one parent often was pressured to undergo sterilization, and the penalties sometimes left women with little practical choice but to undergo sterilization or abortion. Some provinces required termination or other "remedial measures" if a pregnancy was unauthorized. Financial and administrative penalties for unauthorized births were strict, including job loss or demotion, loss of promotion opportunity, expulsion from the Chinese Communist Party, destruction of private property, and fines that could reach ten times a person's annual disposable income. The law granted preferential treatment to couples who abided by birth limits.

7

The Country Report further indicated that court orders were required before officials could take "forcible" enforcement action, but the requirement was not always followed. The law stated that officials should not violate citizens' rights in the enforcement of the policy, but those rights and the penalties for violating them were not clearly defined. Citizens could sue officials who exceeded their authority in implementing the policy. Although a 2002 law standardized the implementation of the policies, enforcement varied significantly. Couples who met certain local and provincial regulations could apply for permission to have a second child, and the one-child limit was more strictly applied in urban areas. In most rural areas, couples were permitted to have a second child if the first child was a girl. In July, Shanghai announced plans to encourage couples to have a second child if both parents were "only children." Countrywide, 35% of families fell under the one-child restriction, more than 60% were eligible to have a second child either outright or upon meeting certain criteria, and the remaining 5% were eligible to have more than two children. Some provinces regulated the period of time required between births.

After receiving the government's written response to Ming's motion to reopen, the BIA denied the motion. It noted that an untimely motion to reopen required the movant to show changed country conditions arising in the country of

8

nationality or country of removal, and that such evidence must be material and previously unavailable. It declined to apply the unpublished Second Circuit case included in the application, and it stated that Ming had not shown how the evidence from Fujian Province and other provinces were applicable to him or material to his claim. Furthermore, the documents from China had not been properly authenticated, several documents were incomplete, and a number of the family-planning regulations and reports from Fujian Province had already been addressed by the BIA in precedential decisions. Evidence of fees and administrative punishments did not constitute unambiguous corroboration of incidents of coerced sterilization such as would warrant reopening, and the fact that Ming's children would be considered Chinese nationals was insufficient to demonstrate that Ming would face forcible sterilization. Additionally, Dr. Sapio's analysis of the 2007 Country Report was not relevant, as Ming had not submitted the 2007 Country Report itself. Ming had not shown that he would suffer economic harm rising to the level of persecution. Finally, the BIA held that Ming had shown only a change in his personal circumstances arising from his marriage and the birth of his children, not a change in conditions "arising in the country of nationality" that would create an exception to the filing deadline.

II.

We review the BIA's denial of a motion to reopen removal proceedings for abuse of discretion. *Li v. U.S. Attorney Gen.*, 488 F.3d 1371, 1374 (11th Cir. 2007). This review is limited to determining whether the BIA exercised its discretion in an arbitrary or capricious manner. *Garcia-Mir v. Smith*, 766 F.2d 1478, 1490 (11th Cir. 1985). The moving party bears a heavy burden, *Ali v. U.S. Attorney Gen.*, 443 F.3d 804, 813 (11th Cir. 2006), as motions to reopen are disfavored, especially in removal proceedings, *INS v. Doherty*, 502 U.S. 314, 323, 112 S.Ct. 719, 724, 116 L.Ed.2d 823 (1992).

An alien who is subject to a final order of removal and wishes to reopen the proceedings must file the motion to reopen within 90 days of the date on which the removal order became final. 8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2). Nevertheless, the time limit does not apply if the alien can demonstrate "*changed country conditions arising in the country of nationality* or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii) (emphasis added); *see* 8 C.F.R. § 1003.2(c)(3)(ii). An alien may demonstrate changed country conditions by presenting evidence that local officials' enforcement of the Chinese family-planning policy has intensified, particularly by demonstrating that forced

sterilizations of women with multiple children have increased. *See Li*, 488 F.3d at 1375. An alien cannot circumvent the requirement of changed country conditions by demonstrating only a change in his personal circumstances. *See Chen v. U.S. Attorney Gen.*, 565 F.3d 805, 809-10 (11th Cir. 2009).

Ming presented evidence that China's family-planning policy is enforced through coercive measures and that he, his wife, or both will be required to undergo sterilization upon their return to China. None of his evidence, though, indicated that Zhejiang Province has increased enforcement of the policy or instituted harsher enforcement measures since his removal order became final in 2004. In fact, much of his evidence indicated that the policy remained essentially unchanged during that time. The BIA reasonably concluded that evidence regarding enforcement in Fujian Province and other areas of the country did not provide sufficient evidence that enforcement in Zhejiang Province had changed. *See Garcia-Mir*, 766 F.2d at 1490.

Ming has shown only that he has had two children since the entry of his removal order and, thus, is newly subject to the existing coercive measures. *Cf. Zhang v. U.S. Attorney General*, 572 F.3d 1316, 1318, 1320 (11th Cir. 2009) (holding that petitioner had affirmatively demonstrated escalated enforcement of the one-child policy in Fujian Province); *Jiang*, 568 F.3d at 1254, 1257-58 (same);

11

*Li*, 488 F.3d at 1372, 1375-76 (same). As a change in personal circumstances alone is insufficient to meet the changed-country-conditions standard, the BIA did not abuse its discretion in denying Ming's motion as untimely. *See Chen*, 565 F.3d at 809-10; *Li*, 488 F.3d at 1374.

For the foregoing reasons, we deny the petition for review.

**PETITION DENIED.**